Order may be drawn in accordance with this Opinion.

Lucille H. BURCH

v.

READING COMPANY.

Civ. A. No. 13654.

United States District Court
E. D. Pennsylvania.
March 16, 1956.

* 1948 Revision, 28 U.S.C.A. § 1738.

B. Nathaniel Richter, Richter, Lord & Farage, Philadelphia, Pa., for plaintiff.

Richard P. Brown, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

Plaintiff has filed a motion for a new trial after the jury returned a verdict for defendant at the conclusion of a trial lasting three days in this suit brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51.

At approximately 7 a. m. on a cold, clear, dry day in late November 1950, the plaintiff [a 55-year old widow weighing about 183 lbs. and about 5′ 4½″ tall, who had been working for the defendant railroad company as a track laborer [1] since April 20, 1944] started to work on the south side of Scott's Lane grade crossing of the defendant company. She was bringing loose earth on a small, square, three-foot long shovel from a pile of dirt south of the southerly track and on the east side of Scott's Lane (see spot marked in red on P–2, N.T. 42 [2]), to a point near the west edge of the paved road (see spot marked in red on P–1 and N.T. 32) where the dirt was being filled in under the track and beside the track, apparently in order to give a better foundation for the wooden planks placed next to the tracks (N. T. 42 and D–1),[3] which had raised above the level of the rails. Scott's Lane, which was paved with macadam on a stone base, came up a hill with a 15%

---

1. Her work involved "help dig out ties and work on the track, do anything the men did out there; had to help pull rails and spike * * *" (N.T. 34). She lifted ties, pulled spikes out of rails, and worked on the ballast (N.T. 83 & 85). She had done this type of work for six years prior to her fall (N.T. 83). Mr. Di Luzio testified that, although it was part of the normal job of a track laborer to lift planks, he would not permit plaintiff to do this job on the day of the accident (N.T. 328). He testified that he knew a woman does not have the strength of a man and was always looking for lighter work for her to do (N.T. 340). He told her every day: "Be careful, I don't want you to get hurt." (N.T. 339–340).

2. Scott's Lane runs north and south. Note that D–2 to D–4 show the crossing in 1949, whereas P–1 to P–5 were taken in October 1954. Plaintiff testified that these pictures (D–2 to D–4), taken in 1949, showed the road as it appeared in November 1950 (N.T. 123), except that it was more worn out and had more holes (N.T. 127).

3. The holes near the rails had been washed out as a result of a storm on the previous weekend (N.T. 213–214 & 33).

to 16% grade to the crossing and the base of the pile of dirt was about four feet below the level of the ground at the track where plaintiff was filling in the holes. Plaintiff was wearing galoshes, work clothes and a jacket. All the other members of the section gang or group of workers to which plaintiff was attached were on the north side of the railroad tracks, except for one man who was loosening the dirt in the dirt pile from which plaintiff took the loose dirt on her shovel. Plaintiff had walked back and forth across this road for about an hour prior to her fall.

Between 8:00 and 8:15 a. m., while crossing the road with an empty shovel toward the east side in order to get more dirt, plaintiff fell at a point (see spot marked on P-5 with largest red dot—N. T. 48) three feet south of the southerly track and 2½ to 3 feet west of the east edge of the paved road. Plaintiff testified as follows concerning her fall (N. T. 51–52):

"A. When I was going to get a shovel of dirt, coming back my feet just rolled out from under me and I fell. I could feel pebbles and things—that's all I could feel on my feet, so I went down.

\* \* \* \* \* \*

"By Mr. Richter:

"Q. Now, when you fell down, could you see anything on the ground near your feet that gave you any indication of what had happened? A. All I see was marks from pebbles where my heels had pushed through.

"Q. Now, tell us what the surface of the road was like at that place. A. It was worn out. The road was worn out, and all full of pebbles all the way down, from the rail down.

"Q. How big were these pebbles? A. About the size of my little fingernail.

"Q. Now, when you say pebbles, do you mean two, three, five, or how many? A. No, sir, I mean all over. There is hundreds of them.

"Q. And you say when you fell you saw where your heel had done what? A. Pushed through. Pushed through the pebbles and stones."

Mr. Di Luzio,[4] foreman of plaintiff's section gang, found an ash-color, five- or six-inch heel mark at a level place in the vicinity of where plaintiff fell, but only very few pebbles (N.T. 330), perhaps 20 or 30 scattered around (N.T. 331). Also, he testified that, within two months of the accident, he asked plaintiff what caused her to fall and she never mentioned any pebbles as causing her to fall. She was carrying an empty shovel at the time that she fell. He described the work being done by plaintiff on this day as "light work."

Although the plaintiff testified that the road was narrow and worn out in November 1950, Mr. Chiolan, whose office was on this road south of the crossing, testified that the condition of the paving on this road was generally good in November 1950. Mr. Osborne, a field supervisor for the Philadelphia Department of Streets, testified that he had inspected the road in April 1951 and found that the surface was worn away down to the stone base, with the result that cars would pick up the stones and carry them down the hill. This made the road very slippery so that he "had to be careful to pick his step up from the bottom all the way to the top" of the hill. He also testified that there would not be much difference between the condition of the road when he inspected it in April 1951 and its condition in November 1950.

Plaintiff was taken to the Women's Medical College Hospital, where it was discovered that she had a fracture of the inner side of the left ankle. Several casts were put on her left leg from time to time during the period prior to the

4. Mr. Di Luzio was not at the scene of the fall when it occurred, but got there about 5 minutes later (N.T. 325 & 329).

summer of 1951.[5] She was seen by representatives of the defendant's medical department either at her home or at their office approximately 17 times prior to July 31, 1951,[6] when she was given her return to work card. During this period (particularly in June and July), defendant's medical department asked plaintiff to remove the tight, constricting bandage she was wearing and to walk without her crutch in order to exercise her left ankle and leg.[7] Dr. Jones, called by plaintiff, stated that in the average case of this type, weight bearing on the fractured ankle was desirable eight weeks after the initial injury. Dr. Albert, who examined plaintiff on July 17, 1951, at defendant's request, testified that she was able to return to work and Dr. Hermel, who took X-rays of her ankle on that date, testified that the fracture was "well healed * * * by well organized bony union in excellent position" with no evidence of fibrous material, arthritis or atrophy. Dr. Jones, who examined plaintiff · in

April 1952, testified that she had no need for a cane or crutches at that time and that the first evidence of soft tissue atrophy from disuse was observed by him on his second examination on October 27, 1955. Also, Dr. Jones testified that prolonged use of a brace, tight bandage or crutch would cause atrophy.

Subsequent to the summer of 1951, plaintiff also received treatments at Philadelphia General and Temple University Hospitals. Dr. Bonner (one of plaintiff's medical witnesses) diagnosed her condition on November 9, 1955, as "arthritis, tenosynovitis, bursitis, and 10–20% nerve injury."[8] Dr. Farrell, called by plaintiff, stated that his X-rays taken in November 1955 indicated (a) definite evidence of deformity at a location where it would cause disability, (b) that the joint would become tired more quickly than a normal joint with walking, (c) that the condition was permanent, and (d) that there was slight atrophy due to disuse, as well as evidence ·of arthritis.[9] The plaintiff testi-

---

5. When the first cast (a walking cast) was removed on 1/5/51, the doctors at Women's. Medical College Hospital advised plaintiff to use heat treatments. Plaintiff continued to consult the doctors at this hospital until the fall of 1951.

6. N.T. 270–280.

7. Dr. Albert, an orthopedic specialist, found that plaintiff could walk equally well with, or without, the cane she was using on July 17, 1951, when he examined her at the request of defendant (N.T. 376). He testified, at page 378:
 "She even jumped when her toes were moved. She refused to bear any weight on her left foot and stated she was unable to, yet a few moments before she had walked back and forth across the room in excellent fashion holding the cane above the floor and actually not using it.
 "Before any part of the foot, ankle, or lower leg was touched, she rapidly withdrew the part and shouted with pain.
 "We did x-ray studies, and these x-ray studies showed a well-healed oblique fracture about the lateral malleolus, which is the prominent bone on the outer side of the ankle. Actually the fracture was a bit above the ankle joint itself and

more accurately would be in the lower end of the shaft of the fibula.
 . "There was no distortion of the ankle joint whatsoever. The joint margins were smooth. It looked like a perfectly normal ankle joint."
 In Dr. Albert's opinion, she would have gotten along quite well without any support, and could have returned to work (N.T. 379). He testified that it was desirable for people in her position to be as active as possible (N.T. 380).

8. His testimony at N.T. 145 is:
 "I saw her first on November 9, 1955, this month, and at that time the patient gave findings indicating that she had an arthritis, traumatic, chronic, of her left ankle; a tenosynovitis, post-traumatic, chronic, at the tendon of the anterior tibeal muscle. She had a bursitis, post-traumatic, chronic, of the Achilles bursa, and nerve injury, 10 to 20 per cent, below the. knee.of left .side." .
 At N.T. 178, he testified that 10 to 20. per cent. of a denervement is little.

9. N.T. 139–141. Dr. Hermel (N.T. 388 ff.) and · Dr. Jones denied ' that there' was any bone atrophy or evidence of arthritis visible in X-rays taken on October 27, 1955 (N.T. 410–421).

fied that the doctors had not payed "much attention" to her complaints (N. T. 70–73).

In view of the strong feelings of counsel in favor of, and against, the motion for new trial and the length of the briefs and letters [10] with authorities which have been submitted, the trial judge has considered almost all the objections to the conduct of the trial raised by counsel for plaintiff at greater length than is usual. The inability of the trial judge to see any merit in plaintiff's contentions rests on basic differences of approach in these three particulars, as well as on the matters covered in parts I to III of this opinion below:

**1.** A federal trial judge is not a mere moderator but has an affirmative duty to see that the relevant evidence on the issues to be decided by the jury is submitted to the jury as clearly as possible. See Packwood v. Briggs & Stratton Corp., 3 Cir., 1952, 195 F.2d 971, certiorari denied, 1952, 344 U.S. 844, 73 S.Ct. 61, 97 L.Ed. 657; Garrison v. United States, 4 Cir., 1932, 62 F.2d 41, 42.[11]

The approach of counsel for plaintiff is exemplified by this language made in objection to the charge (N.T. 525):

"I take exception to the fact that Your Honor took the trouble to remark, *something which the defendant's counsel never even thought of,* that while Dr. Bonner saw the records at the Philadelphia General Hospital and saw the records up at the Temple Hospital, he did not see the records up at the Women's Medical College Hospital." (Emphasis supplied.)

As the trial judge understands his function, the question of whether defendant's counsel thought of a material point is not the test of whether it is worthy of being called to the jury's attention.[12]

It has been repeatedly held that it is not reversible error for a federal trial judge to comment upon, and express his opinion upon, a particular item of testimony so long as the decision as to the weight and effect of the testimony is left to the jury.[13] See Vicksburg & M. R. Co. v. Putnam, 1886, 118 U.S. 545,

---

10. The last of several communications with authorities was dated 2/29/56 and was received by the trial judge on March 2, 1956.

11. In the Packwood case, the court said, 195 F.2d at page 973:

"This authority and responsibility to keep jury findings within reasoned rules and standards is an essential function of United States judges today as it long has been of common law judges. See Capital Traction Co. v. Hof, 1899, 174 U.S. 1, 13–16, 19 S.Ct. 580, 43 L.Ed. 873. It stands as a great safeguard against gross mistake or caprice in fact finding."

12. As is pointed out in Exhibit A, one of the damage issues concerned the condition of plaintiff on July 31, 1951, when she was given her return to work card, and, although Dr. Bonner made several broad statements, he had never seen the hospital records for the period prior to 1952, during which period plaintiff was treated at the Women's Medical College Hospital.

13. At the beginning of the charge, this language was used at page 484:

"You as the jury are the sole and exclusive judges of the facts. If anything I say in this charge concerning the evidence is not in accordance with your memory and your understanding of what has been testified to, you must disregard what I say as to those facts. That is your province. Your understanding of the facts and your memory of the facts are to control."

This point was re-emphasized throughout the charge (see footnote 71 below). In the supplementary part of the charge, the trial judge stated, at pages 528 and 530:

"You certainly may find that—that is up to you—and I, of course, referred only to very small parts of the testimony. You must consider all of it.

\* \* \* \* \*

"\* \* \* it is for you to find the facts, and nothing I said should be allowed to make you feel that the plaintiff had not sustained her burden of proving this case or that she had. That is for you to decide. That is your problem."

553, 7 S.Ct. 1, 30 L.Ed. 257; Graham v. United States, 1913, 231 U.S. 474, 480, 34 S.Ct. 148, 58 L.Ed. 319; Lever Brothers Co. v. Atlas Assurance Co., Ltd., 7 Cir., 1942, 131 F.2d 770, 778–779; Zurich v. Wehr, 3 Cir., 1947, 163 F.2d 791, 793.[14]

■ 2. The evidence in this case presented a much stronger case for defendant than for plaintiff and the trial judge cannot make up for deficiencies in the plaintiff's evidence in order to present a case of equal weight to the jury. See Gallagher v. Hildebrand, 285 Pa. 350, 352, 132 A. 174 (1926). The trial judge tried to lean over backwards in being impartial and fair to the plaintiff because of the weakness of her case.[15]

■ 3. Where counsel, with advance notice that his case will be listed first on the first day of a trial period, fails to present to the trial judge any written trial memorandum and does not present any Requests for Charge within the time prescribed by the rules, he cannot object that his contentions have not been submitted to the jury in the manner he would have preferred.

**I.** Contention That Verdict Was Against The Law (Paragraphs 3, 10 & 36 of Motion for New Trial).

Plaintiff apparently contends under this point that the court ruled, as a matter of law, that the plaintiff could not recover on the ground that defendant subjected her to a job too hard for her to perform as a woman. The court did not use any such language in the charge and, at the request of counsel for plaintiff, did charge the jury that they should take into consideration "the physical capabilities of the employee under the circumstances" in determining whether the plaintiff exercised "ordinary care to assure that" the plaintiff had a reasonably safe place to work (N.T. 506–507).

14. In the Vicksburg case, the United States Supreme Court stated the rule as follows, 118 U.S. at page 553, 7 S.Ct. at page 2:

"In the courts of the United States, as in those of England, from which our practice was derived, the judge, in submitting a case to the jury, may, at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment upon the evidence, call their attention to parts of it which he thinks important, and express his opinion upon the facts; and the expression of such an opinion, when no rule of law is incorrectly stated, and all matters of fact are ultimately submitted to the determination of the jury, cannot be reviewed on writ of error."

15. Among the requests of counsel for plaintiff which were granted over the objection of counsel for defendant are these:

(a) Request that the transcript of the testimony given by plaintiff at the company hearing within two months of the accident (where she was represented by her union representative) be kept from the jury, even though her only description of the road at that time was that it was "dry and frozen" and though she made no comment on her foreman's description of the road as being "free of loose stones and dirt."

(b) Request that the jury be instructed that there was no particular significance in the accident occurring on the city street, rather than on the property of the Reading Company (N.T. 24–26 & 31).

(c) Request that plaintiff be permitted to testify to injury to her side, even though this was not mentioned either in the complaint or at the pre-trial conference (N.T. 68–72).

(d) Permitted plaintiff's doctor to testify after counsel for plaintiff had suggested the answers to him by leading questions (for example, N.T. 181, 187, & 190).

(e) Request to call track supervisor (Mr. Morrison) of one subdivision of defendant under cross-examination as a managing agent under Rule 43(b) (N.T. 228–232).

(f) Permitted what amounted to cross-examination of witness (Dr. Cherner) called by counsel for plaintiff, even though he was clearly not a managing agent within the terms of Rule 43(b) (N.T. 266 ff.).

As pointed out below, the court only included the subject of contributory negligence in the charge at the suggestion of counsel for plaintiff (N.T. 479–481). See also other matters in the charge favorable to plaintiff mentioned in footnote 86.

It also should be noted that plaintiff neither included in her requests for charge filed with the court a request to charge that defendant subjected plaintiff to a job too hard for her nor did plaintiff specifically point out to the court its failure to charge on this point.[16] None of the cases relied on by plaintiff [17] to support her position that defendant was negligent in giving plaintiff the type of work she was doing at the time of the accident are applicable to the facts of this case.[18] Her foreman testified that he gave her the lighter work of carrying loose dirt in a small shovel and would not permit her to lift the planks near the rails (see footnote 1). There is neither evidence that she complained that the work assigned to her on this day (or any other day) was too hard for her nor evidence that the carrying of the dirt contributed to her fall, since she had only an empty shovel in her hand when she fell (N.T. 45).[19] Hence, there is no evidence that plaintiff was forced to do work which was too difficult for her within the theory of the cases cited in footnote 17. The courts emphasized that the female plaintiffs had complained that the work was too difficult for them in the last two cases cited in that footnote.

In this connection, plaintiff's counsel argues in his brief (pp. 24–26) that the action of the trial judge in striking out the testimony of Mr. Morrison, track supervisor of one sub-division of defendant's railroad, was error sufficient to justify a new trial, even though no objection by plaintiff's counsel to this ruling appears on the record (N.T. 430–431). Mr. Morrison, called on cross-examination by plaintiff under F.R.Civ.P. 43(b), 28 U.S.C.,[20] was asked about a memorandum concerning a road trip by the Board of Directors of defendant on April 26 and 27, 1949, which memorandum concluded with this paragraph (P–12):

> "Also make general cleanup of papers, rubbish, etc. on your section and keep your women laborers out of sight when this train passes."

He testified that some of the time of both men and women track laborers had to be spent in picking up papers and that this memorandum was put out because the Directors did not like to see track laborers doing light work, since they were hired and paid for heavy work. When plaintiff's foreman, Mr. Di Luzio, was questioned about receiving the orders contained in this memorandum, he testified that he did not remember receiving the order and counsel for plain-

16. See F.R.Civ.P. 51. See Jack v. Craighead Rice Mill Co., 8 Cir., 1948, 167 F. 2d 96, certiorari denied 334 U.S. 829, 68 S.Ct. 1340, 92 L.Ed. 1756; cf. Trowbridge v. Abrasive Co., 3 Cir., 1951, 190 F.2d 825; Campbell v. Krauss, 3. Cir., 1918, 249 F. 670.

17. Stone v. New York, C. & St. L. R. Co., 1953, 344 U.S. 407, 73 S.Ct. 358, 97 L. Ed. 441; Robak v. Pennsylvania R. Co., D.C.E.D.Pa.1949, 81 F.Supp. 841, affirmed, 3 Cir., 1949, 178 F.2d 485; and Comiskey v. Pennsylvania R. Co., 2 Cir., 1956, 228 F.2d 687.

18. There is no evidence that plaintiff had been given such heavy work previously that she was worn out by it on the day in question. At page 82 of plaintiff's brief, this language is used:
"There was evidence that she was strong and vigorous and able. There was no proof that she was under any physical disability of any sort."

19. It has been repeatedly held that questions are not to be submitted to the jury where there is no more than a scintilla of evidence that the injuries could have resulted from conduct alleged to be negligent. See Gill v. Pennsylvania R. Co., 3 Cir., 1953, 201 F.2d 718; Chesapeake & Ohio Ry. Co. v. Thomas, 4 Cir., 1952, 198 F.2d 783, 788; Brady v. Southern Ry. Co., 1943, 320 U.S. 476, 479–480, 64 S.Ct. 232, 88 L.Ed. 239; Finnegan v. Monongahela Connecting Ry. Co., 1954, 379 Pa. 63, 72–73, 108 A.2d 321.

20. The trial judge may have erred in relying on counsel for plaintiff's insistence that Eckenrode v. Pennsylvania R. Co., 3 Cir., 1947, 164 F.2d 996, 999, justified the leading questions and breadth of cross-examination conducted by counsel for plaintiff, Cf. Rubin v. General Tire & Rubber Co., D.C.S.D.N.Y.1955, 18 F.R.D. 51, 55–56, but the verdict of the jury makes this question academic.

tiff acquiesced in the court's direction that Mr. Di Luzio's testimony on this point be stricken. Mr. Di Luzio never testified that he passed these orders on to plaintiff and he testified, to the contrary, that he gave her the lighter work of his own volition (see footnote 1).[21]

In an effort to show that the above-quoted language was recognition on the part of the railroad that its management was requiring women to do work beyond their physical capabilities (N.T. 75) and did not approve of their doing light work, such as picking up papers, counsel for plaintiff also examined Mr. Morrison concerning a memorandum of February 15, 1949, to plaintiff, telling her to report for a hearing and investigation involving her inability to perform the work of a track laborer, and a memorandum of February 26, 1949, asking her to report on March 1 for a supplemental hearing involving this subject. Mr. Morrison testified that plaintiff stated she was able to do the work of a man and he did not remember her ever complaining that her work was too heavy. Plaintiff testified that she was always ready and willing to do any of the work of a track laborer prior to November 27, 1950.

Since plaintiff was unsuccessful in showing any admission by the company, or by Mr. Morrison personally, or any other evidence that plaintiff was doing any work in excess of her physical ability or that plaintiff had ever made a claim that she had been asked to do work which was too difficult for her, and since consideration of this testimony and these memoranda had emphasized conflicting inferences that might be drawn from the language of four exhibits (P-9, P-10, P-12 and P-13),[22] offered by plaintiff, the court granted defendant's motion to strike the testimony of Mr. Morrison just before the closing speeches [23] and advised the jury to disregard the testimony of Mr. Morrison at the beginning of the charge.[24] Since the court did not include P-8 [25] in the motion to strike and permitted this exhibit to go out to the jury (N.T. 533), the record contained both in this exhibit and in plaintiff's testimony evidence that plaintiff was required, as far as the defendant

---

21. Also, the action of the trial judge in granting the motion to strike Mr. Morrison's testimony is not a proper basis for a new trial in view of the position taken by counsel for plaintiff at the trial and the state of the record when the motion to strike was granted. When counsel for plaintiff first made an offer of proof on this subject, he stated he would ask plaintiff what directions she received from from her foreman on the subject of these memoranda and would later show that her foreman acted on authority from his superiors (N.T. 74 & 75). At this time, counsel for plaintiff said (N.T. 75 & 76):

"It wouldn't make the slightest bit of difference in my case if I showed ten thousand orders from the railroad if, in fact, they were not communicated to her and she wasn't affected by them. I have got to show that, in fact, they did order her, otherwise I have a gap in my proof, so I must show through her, her reaction, her mental frame of mind, and what she did in response to the orders that were given."

Plaintiff's counsel then stated that he would be glad to call plaintiff back at a later point in the case after proving orders from her superiors (N.T. 76).

Furthermore, plaintiff was never called back to the stand and questioned on these memoranda or the orders contained in them.

22. It should be noted that P-13 contains exactly the same language that appears on P-12 and P-10.

23. In sustaining the motion, the court said (N.T. 430):

"* * * a motion has been made by the defendant to strike the testimony of Mr. Morrison, and I will grant that motion and strike his testimony, because I do not feel that it has been tied in in any way to make it relevant in this case, and that it will merely confuse the jury with irrelevant evidence; and I direct that no reference to that testimony be made in the closing speeches * * *."

24. N.T. 482-483.

25. P-8, dated May 14, 1948, provides:

"All women track laborers must be kept in the gang and do the same work as the other laborers in the gang. I am giving each woman laborer a letter to that effect so there will be no misunderstanding."

company was concerned, to do all the duties of a track laborer. The controversial memoranda and Mr. Morrison's testimony added nothing to the record which could do more than indicate that defendant believed at one time in 1949 that plaintiff took the position that she was incapable of doing all the work of a track laborer, that two hearings were held on the subject, and that at these hearings she said she was able to do the work of a male track laborer.[26]

It is improper to permit in evidence testimony which might tend to draw the minds of the jury from the important issues, especially where it may prejudice, confuse or mislead them into giving their attention to collateral matters. See Cleland v. Peters, D.C.W.D. Pa.1947, 73 F.Supp. 769, 773; Howser v. Pearson, D.C.1951, 95 F.Supp. 936, 941;[27] cf. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 229–230, 60 S.Ct. 811, 84 L.Ed. 1129; National Labor Relations Board v. Donnelly Garment Co., 1947, 330 U.S. 219, 236, 67 S.Ct. 756, 91 L.Ed. 854; Thompson v. American Steel and Wire Co., 1934, 317 Pa. 7, 11, 175 A. 541.

In the Cleland case, the court rejected certain evidence until a proper foundation had been established to make it relevant. No such foundation was ever established in this case relating the memoranda either to plaintiff or to the issue of the physical difficulty of the work done by plaintiff at the time of the accident.

## II. Contention That Verdict Was Against The Evidence.

A. Testimony by Dr. Cherner from Opinions in Medical Reports by Other Doctors (Paragraph 6 of Motion for New Trial).

It seems clear that even if there were errors in the admission of medical testimony, all of which concerned solely the damages, such errors would be no basis for a new trial in view of the verdict for the defendant. See George P. Clark Co. v. Kuebler Foundries, 3 Cir., 1922, 285 F. 568, 569; Gallagher v. Hildebrand, 1926, 285 Pa. 350, 352, 132 A. 174; Harkinson v. Pennsylvania Co., etc., 1938, 329 Pa. 209, 212, 198 A. 11.[28] However, since the plaintiff has put such reliance on this reason for new trial in his brief, the trial judge will explain his legal position in admitting this testimony.

Plaintiff's counsel called Dr. Cherner, a medical doctor employed by defendant to take care of its injured and sick employees and follow their progress (N.T. 294), with his records, and documents concerning plaintiff (N.T. 260). Dr. Cherner was asked whether his records showed that it was a fact that Dr. Wolcott at Women's Medical College Hospital wanted to perform an open reduction operation on plaintiff but that

---

26. At pages 25–26 of his brief, counsel for plaintiff contends that the Directors of the defendant wanted to get rid of their women workers and that Mr. Morrison had been ordered to achieve this result, but the trial judge can find no basis for such an inference in his testimony.

27. See also such cases as Packwood v. Briggs & Stratton Corp., 3 Cir., 1952, 195 F.2d 971, 973, certiorari denied 1952, 344 U.S. 844, 73 S.Ct. 61, 97 L.Ed. 657, cited above at page 143 of 140 F.Supp. In the Howser case, supra, Judge Holtzoff said, 95 F.Supp. at page 941:

"There is a natural and frequent tendency for trials to move on tangents and away from the main issues. It is a function, even a duty, of the trial judge to control and check this tendency of his own motion."

28. This rule is particularly applicable in this case, where the court charged that, even though the defendant's theory of damages was accepted by them, the plaintiff would be entitled to about $1,800 of lost earnings (N.T. 500), as well as damages for pain and suffering, injury and inconvenience, mental and physical (N.T. 501 ff.) if the defendant was liable due to its negligence. Under the charge, the jury would have been sure to bring back an amount at least in excess of $1800. if they had found that liability existed so that the verdict for the defendant must have meant that the jury considered neither the evidence on damages nor the part of the charge on damages.

Dr. Neupauer (head of defendant's medical department) directed that the operation not be performed and answered "That is correct." Dr. Cherner then asked to explain his answer by reference to a letter of August 22, 1951 (P–11). The trial judge ruled, on objection by plaintiff, "that the witness should not discuss the letter of August 22, 1951, as the matter therein is a proper subject of cross-examination."[29] However, counsel for plaintiff, rather than waiting for the cross-examination as suggested by the court, proceeded to examine this witness on part of this letter. The witness commenced a lengthy explanation of the background of the letter, but counsel for plaintiff first objected at page 275, where Dr. Cherner testified that a Dr. Swenson, of Jefferson Hospital, took X-rays in June 1951 which showed an old, healed fracture at the lower end of the fibula.[30] Particularly in view of the previous and later testimony, in accord with the opinion of Dr. Swenson, that the fracture was healed,[31] this testimony was, at the least, admissible in order to show the good faith and reasonable cause of defendant's medical department in opposing the proposed open reduction operation.[32] Counsel for plaintiff's objection to cross-examination of this witness on another part of this one-page letter of August 22, 1951, was properly overruled, since the defendant was entitled to show its objection to the operation was based, in part, on the findings of the Women's Medical College Hospital's radiologist (Dr. Vastine), irrespective of the validity of those findings.[33]

**B. Verdict as Against the Weight of the Evidence (Paragraphs 1 and 2 of Motion for New Trial).**

There is ample evidence in the record to support the verdict of the jury that the plaintiff's injuries did not result, in whole or in part, from the negligence of the officers, agents, or employees of the defendant.[34] The jury was entitled to find that the plaintiff's injuries were not the result of any negligence in providing for plaintiff the

---

29. The court went on to state (N.T. 265): "I will permit him to cross-examine, because the plaintiff has as part of its case put in evidence a direction by the railroad prohibiting an operation, and I believe that it is the proper subject of cross-examination for the defendant to go into that evidence which has been offered as part of the plaintiff's case. If he wants to offer this letter in evidence, then he will have to establish a basis for that, and that will be another thing."

It is proper on cross-examination to bring out matter explaining what was said on direct examination. Mintz v. Premier Cab Ass'n, 1942, 75 U.S.App. D.C. 389, 127 F.2d 744; Conley v. Mervis, 1936, 324 Pa. 577, 188 A. 350, 108 A.L.R. 160. It should also be noted that a witness may explain an answer, to which explanations counsel for plaintiff apparently objected. See 58 Am.Jur., Witnesses, 574, and cases there cited.

30. Counsel for plaintiff had every opportunity to terminate his examination of this witness (see, for example, N.T. 291), but he elected to continue his examination of the witness he had called.

31. N.T. 269, 273, 388 & 403 (saying there was a firm osseous union), where no ob-

jection was made to the testimony. Also, it should be noted that much of the testimony of Dr. Cherner was from a series of cards concerning plaintiff kept by the medical department of the defendant (N.T. 309–310). Such cards were available to, and examined by, counsel for plaintiff (N.T. 310). They were apparently admissible in evidence, even if objection had been made to the testimony based on them. See 28 U.S.C.A. § 1732 and 28 P.S. § 91b.

32. See 1 Henry, "Pennsylvania Evidence" (3rd Ed.), § 441, p. 435.

33. See 1 Henry, op. cit. supra, at pp. 435–436, and Ryman's Case, 1939, 139 Pa. Super. 212, 221, 11 A.2d 677.

34. That part of the Federal Employers' Liability Act which provides "or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment," 45 U.S.C.A. § 51, seems inapplicable on the facts of this case since there is no evidence of any defect or insufficiency of defendant's property contributing to the injuries.

path from the pile of dirt to the track across the paved city road, in view of Mr. Chiolan's testimony that the condition of the road just south of the track was generally good and Mr. Di Luzio's testimony that there were "very few" pebbles on the road. A careful reading and re-reading of the record has confirmed the opinion of the trial judge as stated as follows at the conclusion of the plaintiff's case, when defendant made a motion for dismissal of the action under F.R.Civ.P. 41:[35]

"I am very concerned as to liability. I will permit the case to go to the jury, but I think it is only fair to say to Mr. Richter, for whatever value he considers it, that I consider this case is a very thin case on liability. I think it is only fair that I tell Mr. Richter this."

### III. Contentions Concerning the Charge.

In considering the many objections made by plaintiff to the charge, the following two principles must be kept in mind:

1. *The charge must be considered as a whole.* Plaintiff's brief, in many cases, takes a small portion of the charge (often a single sentence—see, for example, pages 44 and 84) and criticizes it without taking into consideration other parts of the charge. The charge must be judged in its entirety. McLeod v. Union Barge Line Co., D.C.W.D.Pa.1951, 95 F. Supp. 366, 369, affirmed 3 Cir., 1951, 189 F.2d 610; Goodyear Fabric Corp. v. Hirss, 1 Cir., 1948, 169 F.2d 115, 117; Louisville & Nashville R. Co. v. Farmer, 6 Cir., 1955, 220 F.2d 90, 98–99.[36]

2. *Plaintiff's requests for charge were not submitted within the time prescribed by the rules and need not be considered.*[37] Both parties had ample notice that this case would be called for trial at 10 a. m. on the first day of the trial period, but the trial judge received no authorities, or statement of position, in writing from counsel for plaintiff until approximately 9:30 of the morning he was scheduled to give his charge at 9:45.[38]

---

35. Because there was more than a scintilla of evidence in plaintiff's favor, the motion for dismissal under F.R.Civ.P. 41 was denied. See cases collected in footnote 3 of Gill v. Pennsylvania R. Co., 3 Cir., 1953, 201 F.2d 718, 720. Plaintiff's brief (p. 31) quotes the trial judge as saying to counsel for plaintiff after the jury retired that "we undoubtedly would get a verdict." The trial judge does not remember using the word "undoubtedly" but his own experience has indicated that plaintiffs usually get verdicts in personal injury cases. In the two other F. E. L. A. cases he has tried, there have been verdicts for the plaintiffs. The trial judge did *not* say that he believed the plaintiff was entitled to a verdict on the weight of the evidence.

36. In the McLeod case, the court said:
"Plaintiff in asserting that the charge on 'unseaworthiness' brought the subject into the limited sphere of foreseeability, commits the frequent fallacy of quoting out of context. The charge must be considered as a whole with a view of determining the impression conveyed thereby to the jury, and determining whether the charge was misleading."

In the Louisville & Nashville R. Co. case, the court said:
"We are not in accord with the tendency which we have observed here and there to lift, as a ground for reversal, a single inconsistent and incorrect paragraph from the context of a well-rounded charge, correct when viewed in entirety. We must consider whether, upon the whole, the charge of present concern gave appropriate and proper instructions upon applicable law in such fashion as would be unmistakably understood by the jury. Applying this standard, though there is an ambiguity, we find no reversible error in the subject matter of the charge pertaining to the applicability and effect of section 2628(4) of the Code of Tennessee."

37. See paragraph 11 of motion for new trial as supplemented.

38. The evidence had been closed and the closing speeches of counsel had been given the day before. After the trial judge had completed preparation of the outline of his charge, eleven pages of plaintiff's points for charge were delivered to his chambers.

The first sentence of F.R.Civ.P. 51 provides:

> "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests."

Under such circumstances, it is clear that the failure of the trial judge to read all these requests for charge would not have been ground for a new trial.[39] See Paul v. Duluth, Missabe & Iron Range Ry. Co., D.C.D.Minn.1950, 96 F. Supp. 578, 580.

A. Part of Charge Concerning Sympathy and Prejudice [40] (Paragraph 4 of Motion for New Trial).

 The closing speech to the jury of counsel for plaintiff contained this language:

"That is for five long years she would have made $60 or $62 a week, whatever it amounts to, and she would have had that $15,000 to spend on herself, and, yes, to be a human being herself, too, and to continue to do the same kind of decent thing she did before when she took two colored foundlings and raised them as her own, when she raised two little children like her own, and gave to them a mother's feeling, a mother's care.

"If she wanted to spend it on those little children, she had a right to do it. She had a right to have that $15,000. coming into her home, slowly, in small amounts, save a dollar, do something that would give her pleasure; and her pleasures in her simple way were not fancy dress

---

The trial judge did read 14 of the 26 paragraphs requested by plaintiff. Plaintiff complains that the trial judge read paragraphs 1, 2, 4, 6, 7 and 8 in too low a voice and too quickly. While the trial judge was reading paragraph 8, counsel for plaintiff interrupted him, saying, "You are going too fast * * *" but not mentioning the low tone of voice, now also a subject of complaint. The trial judge started reading paragraph 8 again from the beginning and, after completing this paragraph and one more paragraph, said to the jury (N.T. 507):

"Now if I read any of these too fast, I want you, any member of the jury, of course, to stop me.

"Do you think you have understood them as I have read them?

"You are all nodding your heads affirmatively, that I haven't read these too fast, and you understand them. That will go on the record."

In spite of the trial judge's use of the word "any," counsel for plaintiff contended at the argument of the motion for new trial that the jury, by nodding their heads, only indicated that they understood the paragraphs read after his interruption of the trial judge (paragraphs 8, 13, and the following paragraphs), and he still contends the jury could not have understood paragraphs 1, 2, 4, 6 & 7. The trial judge has acted on the motion for new trial and prepared this opinion on the assumption that these five paragraphs were not read in order to give plaintiff the benefit of every doubt, al-

though the trial judge believes the jury, by nodding affirmatively, indicated they understood these paragraphs.

39. It should also be noted that the contents of points 1 to 7 were covered by the charge as delivered, so that, even if plaintiff had complied with the first sentence of F.R.Civ.P. 51, there was no error in failing to read them. See Dubrock v. Interstate Motor Freight System, 3 Cir., 1944, 143 F.2d 304, 306, certiorari denied 1944, 323 U.S. 765, 65 S.Ct. 119, 89 L.Ed. 613.

40. After counsel for plaintiff had stated numerous objections to the charge (N.T. 521–527), the court had supplemented its charge (N.T. 528–532), and the Marshal had been sworn and was about to take the jury out, counsel for plaintiff came up to sidebar and excepted to this paragraph of the charge (N.T. 532–533). The trial judge does not believe that rushing up at the last minute to make additional objections to the charge is within the spirit of the requirement of F.R.Civ.P. 51, stating that such objections must be made before the jury retires. However, counsel for plaintiff has been so upset by the second sentence of this paragraph of the charge, which seems to the trial judge actually the least he could do in view of the closing speech of plaintiff's counsel, that the trial judge would not wish him to be denied a new trial on this ground if this sentence is prejudicial error justifying a new trial.

and fancy living, but being a mother to little children that needed it. I think that nothing bespeaks more wondrously for this fine little woman than what she actually did, because her acts speak louder than words." (N.T. 448–449).

\* \* \* \* \* \*

" \* \* \* so I give you my solemn word that whatever this woman gets will be protected for her with some substantial life insurance company, so that she will be paid by them week by week and year by year, and if she should pass away from this world before that time, let her leave to those who are near and dear to her what any of us would leave if we had accumulations that we wanted to leave to our family or those that were dear to us." (N.T. 455–456).

In view of this emphasis on these "little children" and the plaintiff having something to leave to those "who are near and dear to her," the trial judge felt it was his duty to neutralize any possible prejudice by including in his charge a sentence indicating that there might be those interested in the defendant who were also in need and included the following paragraph in his charge:

"If you are sympathetic or prejudiced in favor of or against either the plaintiff or the defendant, you should not allow such sympathy or prejudice to influence you at all in your verdict. You should no more be swayed by sympathy for the plaintiff than for the widows and orphans who may be receiving dividends or interest from the defendant company and who may need that income for themselves and for their families. No sympathy of any sort for either side should play any part in your decision." (N.T. 483).

The Federal Courts have consistently and repeatedly emphasized that the Fed-

eral trial judges have an affirmative duty to act on their own motion and to counteract irrelevant, prejudicial remarks of counsel. See Chicago and North Western Ry. Co. v. Kelly, 8 Cir., 1934, 74 F.2d 31, 35; F. W. Woolworth Co. v. Wilson, 5 Cir., 1934, 74 F.2d 439, 442–443, 98 A.L.R. 681; London Guarantee & Accident Co. v. Woelfle, 8 Cir., 1936, 83 F.2d 325, 338–339; Beck v. Wings Field, Inc., 3 Cir., 1941, 122 F.2d 114, 117; Hockaday v. Red Line, Inc., 1949, 85 U.S.App.D.C. 1, 174 F.2d 154, 156, 9 A.L.R.2d 601; New York Central R. Co. v. Johnson, 1929, 279 U.S. 310, 318, 49 S.Ct. 300, 73 L.Ed. 706.

B. Part of Charge Concerning Burden of Proof (Paragraphs 5, 25 and 26 of Motion for New Trial).

The portions of the charge concerning the burden of proof is contained in the paragraphs on pages 490, 495–496 and 511. Plaintiff objects to the use of the word "convince" once and the word "conviction" twice on page 490. One can agree with counsel for plaintiff and Judge Frank that it would be better not to use those words in a civil case without finding their use, together with language making clear that the burden was to prove "by the weight or fair preponderance of the evidence" grounds for a new trial. See Larson v. Jo Ann Cab Corp., 2 Cir., 1954, 209 F.2d 929. Counsel for plaintiff seeks to distinguish this decision, which refused to grant a new trial even though the words "convince" or "conviction" were used many times, on the ground that no objection was made in that case to the charge. However, although counsel for plaintiff objected to the charge, which he contends repeatedly commented on the kind of proof required, he did not object to the use of the words "convince" and "conviction," which use could have been remedied easily if objection and the ground therefor had been stated distinctly as provided by F.R.Civ.P. 51.[41]

41. Furthermore, in the Larson case, the trial judge used the words "conviction" and "degree of conviction" innumerable times (see at pages 929 & 930) in the original charge and in supplementary instructions given when the jury returned

**152**

Plaintiff also objects to the statement that "The evidence must do more than raise a doubt in your mind * * *." [42] In using this wording, the trial judge was relying on the language of the United States Supreme Court in Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, at page 112, 62 S.Ct. 156, at page 161, 86 L.Ed. 89, where the court said:

"Wherever the burden rests, he who undertakes to carry it must do more than create a doubt which the trier of fact is unable to resolve. [Citing cases.] The English courts * * * have reached the same conclusion. [Citing cases.]" [43]

Counsel for plaintiff argues that the facts of the Commercial Molasses case are different than those involved here. While this is true, the Supreme Court in that case discussed the burden of proof in a civil case at length and plaintiff's distinctions do not seem significant. Also, counsel for plaintiff submitted no requests for charge on the burden of proof and no requests at all within the time prescribed by F.R.Civ.P. 51. [44]

The complaint of counsel for plaintiff at pages 39 ff. of his brief, that the charge indicated that the preponderance of the evidence was a heavier burden than that contemplated by the language

---

to the courtroom to ask if they had to arrive at a decision on the basis of proof "beyond the shadow of a doubt." At page 935, Judge Frank said:

"We ought not, therefore, forever base decisions on unverified assumptions about jurors' comprehension of differences between 'preponderance' and 'conviction.'"

**42.** The paragraph containing this language read as follows (N.T. 495–496):

"Now, this is one of the big points for you, this question of whether the plaintiff has proved to you by a preponderance of the evidence that there was a failure to use reasonable care under all these circumstances. There she was with her galoshes, her overalls, her work jacket. The evidence must do more than raise a doubt in your mind on these points, if plaintiff is to sustain the burden. If there is just a doubt in your mind, you must bring in a verdict for the defendant, and that ends your consideration of the case. You don't need to go any further. On the other hand, if you are convinced by the preponderance of the evidence that the defendant or its employees, other than the plaintiff, were negligent, and that this negligence was a factor in causing the injury, then you must find for the plaintiff."

As pointed out above, other portions of the charge made clear that it was the "fair" preponderance of the evidence which was involved. However, the United States Supreme Court, in discussing at length the burden of proof in a civil case, has referred to the "preponderance of the evidence", not the "fair" preponderance of the evidence. See Commercial Molasses Corp. v. New York Tank Barge

Corp., 1941, 314 U.S. 104, at page 113, 62 S.Ct. 156, at page 162, citing Sweeney v. Erving, 1913, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815, where Mr. Justice Pitney used the phrase "the preponderance of the evidence" at several places in his opinion. See, for example, 228 U.S. at pages 238–239, 33 S.Ct. at page 418.

**43.** The court used similar language at page 111, of 314 U. S., at page 161 of 62 S.Ct., saying " * * * if the bailee does go forward with evidence enough to raise doubts as to the validity of the inference, which the trier of fact is unable to resolve, the bailor does not sustain the burden of persuasion which upon the whole evidence remains upon him, where it rested at the start." (Citing cases.) Also, this language has been used by this court in an opinion written by Judge Kalodner, now a judge of the Circuit Court of Appeals for the Third Circuit. See Thomas Roberts & Co. v. Calmar S. S. Corp., D.C.E.D.Pa.1945, 59 F.Supp. 203, 207, where the court said:

" * * * where the burden rests, he who undertakes to carry it must do more than create a doubt which the trier of fact is unable to resolve."

**44.** On page 3 of counsel for plaintiff's letter of 1/24/56, he refers to "the suggested model charge on the burden of proof heretofore presented to the District Judges for the Eastern District of Pennsylvania." No such model charge has been presented to the trial judge by counsel for plaintiff or anyone else. The trial judge welcomes all the written advice any attorney can give him, but no suggestions received after the closing speeches may be considered in any case.

of "reasonable doubt" applicable to a criminal case, does not seem valid to the trial judge. The exact language used is quoted in footnote 42 and there was no use of the term "reasonable doubt" or explanation of its meaning to this jury, which had only been sitting on civil cases during this term of their duty.

Plaintiff argues (page 86 of her brief) that there was too much repetition of the burden of proof. The space given to this subject occupied three paragraphs (less than three pages) of a charge of 36 pages (not including the part of the charge dealing with contributory negligence, which covered one page).[45]

C. Portion of Charge Concerning Duty To Use Reasonable Care To Provide Safe Place to Work (Paragraphs 16 to 20 & 27 of Motion for New Trial).

The language of the charge dealing with this subject is found at N.T. 489–491, 505–507, 528–529, and last sentence of paragraph on 530.[46] The trial judge believes the instructions given are in accordance with the United States Supreme Court decisions relied on by plaintiff [47] and that the contents of plaintiff's requests which were not read or are deemed not to have been read (see footnote 38) add nothing material in view of the facts of this case, even though those requests were not presented within the time limit prescribed by F.R.Civ.P. 51. Counsel for plaintiff makes the following additional objections which are related to this part of the charge: [48]

1. *The contention that the charge indicated that defendant's negligence depended on the conduct of Mr. Di Luzio alone is not supported by the record.*[49] The charge repeated on at least six occasions that the jury should decide whether defendant used reasonable care under all the circumstances (N.T. 489, 495, 496, 506–507, 510, 528). The charge repeated on at least five occasions that the Federal Employers' Liability Act granted recovery for injuries resulting from the negligence of "any of the officers, agents or employees of the carrier." [50] If there could have been

45. Even if the charge had been repetitive on this point, this language of the court in Palmer v. Miller, 8 Cir., 1944, 145 F. 2d 926, 931, seems pertinent:
"* * * the burden of proof was upon the plaintiff, and we know of no federal rule which limits the number of times that that truth, or any other truth, may be restated by a federal judge in a charge which on the whole is accurate and fair."

46. Plaintiff objects to the language of paragraph 3 of defendant's request for charge (N.T. 511), stating that the fact that the place of work is unsafe does not "by itself" entitle plaintiff to recover. The trial judge finds no error in this language when it is read in its context and along with the instruction at N.T. 496 that defendant "is required * * * under all the circumstances to provide a reasonably safe place for its employees to work" and with the language of paragraph 13 of plaintiff's request (N.T. 506), referring to defendant's "duties to provide a reasonably safe place to work."

47. For example: Blair v. Baltimore & Ohio R. Co., 1945, 323 U.S. 600, 65 S.Ct.

545, 89 L.Ed. 490; Bailey v. Central Vermont Ry., 1943, 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444.

48. Plaintiff contends that the use of the word "all" in the last sentence of this paragraph of the charge minimized in the jury's mind the duty to use reasonable care to provide plaintiff with a safe place to work (N.T. 496):
"The railroad may not defend on the ground that the plaintiff assumed the risk of working at this location which it prescribed. On the other hand, the railroad is not the insurer of the safety of all its employees. It does not guarantee their safety. All it is required to do under all the circumstances is to provide a reasonably safe place for its employees to work."
When the above-mentioned portions of the charge (those referred to in the first sentence under C) are read together with the above paragraph, the trial judge does not believe this contention is justified.

49. See paragraph 16 of Motion for New Trial and N.T. 517–518.

50. N.T. 488–490. In some places the language "officers or employees" of the de-

any doubt on this subject in the jury's mind prior to the court's supplementary charge, it would seem to have been covered by the language of the charge at pages 528–529.[51]

2. *The contention that the trial judge should have charged that the defendant had an affirmative duty to inspect the crossing prior to plaintiff's arrival at work and that the portion of the basic charge on this point contains error is not supported by the cases.*[52] Plaintiff's brief (p. 78) argues that the charge should have included a statement that the plaintiff had the duty to prove affirmatively inspection prior to the fall because counsel for defendant, in his opening speech, "told the jury that since the Railroad Company did not own the public highway where the accident happened that that fact was a complete defense to his case."[53] The trial judge did instruct the jury on this point on two occasions:

(a) After the opening speeches and before any testimony was offered, the court said (N.T. 31):

"* * * in order to prevent your getting any misconceptions or wrong ideas from what may have been said yesterday, I instruct you that it is not necessarily significant that the injury to plaintiff may have occurred on the City street rather than on the property of the defendant, the Reading Company."

(b) The court read paragraph 8 of plaintiff's points for charge, which stated that defendant had an affirmative

---

fendant was used; in others the word "employ*ees*" (emphasis supplied) was used.

51. "In the first place, it is quite true that you must consider whether any employee of the Reading Company was negligent in failing to provide the plaintiff with a safe place to work. Just because I mentioned Mr. Di Luzio does not mean that he was the only one who was charged with that duty. You certainly would have the right to find that this place was a hazardous one and that therefore they should have had superiors of Mr. Di Luzio, more important employees of the Reading Company, go out, and look over the crossing that morning. You certainly may find that—that is up to you—and I, of course, referred only to very small parts of the testimony. You must consider all of it. I was just trying to refer to parts which seemed to me relevant on the vital issues.

"The Reading Company has the duty to use reasonable care in providing its employees with a safe place to work. I didn't mean to indicate that Mr. Di Luzio had the whole job. It is the job of the company, and if any of their employees were negligent, or if they were negligent in omitting to send superiors out there, if you feel that the circumstances would require them to send out superiors to this type of crossing for this type of work, and they didn't do it, that is negligence. there is no question about it."

52. See paragraphs 17 and 18 of the Motion for New Trial and N.T. 516, where, at the conclusion of the charge, counsel

for plaintiff contended "* * * it was your Honor's duty to tell this jury that whoever ordered this particular crossing to be repaired, the big bosses, had a duty to come out and make an inspection of the area before they sent Di Luzio * * *."

53. The following appears at page 16 of the transcript:
"* * * we will show you, first of all, that Mrs. Burch did not fall in between the rails of the crossing on the Railroad Company's right of way that it is its responsibility to maintain, but that she fell on this street, this paved amesite street belonging to the City of Philadelphia.

"Mr. Richter: Now, Your Honor please, that is creating a misstatement of the law. Your Honor said not to talk about law.

"Mr. Brown: I am not talking about the law.

"The Court: There is no question of the law. He is just explaining his version of the facts.

"Mr. Richter: No argument about the facts, but *I don't want any misstatement about the legal obligation of the railroad in relation to the street, too, as well as the railroad.* We discussed that yesterday in chambers, Your Honor.

"The Court: Yes, I appreciate that. All Mr. Brown means to say, I am sure, is that he will show that this fall occurred on the street." (Emphasis supplied.)
The italicized language indicates that it may have been plaintiff who pointed out this possible legal argument to the jury.

duty of inspecting the place of work (N. T. 505–506).

■ After explaining that defendant had the duty to use reasonable care to provide plaintiff with a safe place to work under all the circumstances, the trial judge also said in the basic charge that the jury would have to decide whether defendant's foreman should have had notice of any unsafe condition prior to the time of plaintiff's fall.[54] In the supplemental language of the charge quoted on page 31 above, the court specifically pointed out that the jury might find the defendant negligent in failing to send out "superiors (of Mr. Di Luzio) to this crossing for this type of work." The trial judge finds that the cases (of the many cited by both counsel) which are most in point on this subject are Frizzell v. Wabash R. Co., 8 Cir., 1952, 199 F.2d 153, 157–158, and Kaminski v. Chicago River and Indiana R. Co., 7 Cir., 1953, 200 F.2d 1, 4.[55] In the Kaminski case, the court said at page 4:

"Before defendant can be charged with negligence in failing to remedy the condition which caused plaintiff's injury, or failed to warn plaintiff of the existence of such a condition, it is necessary to establish that the defendant had actual knowledge of the condition, or, in the exercise of ordinary care, should have known of its existence."

The court believes that this part of the charge on this point is supported by these cases and not inconsistent with the United States Supreme Court cases which are reviewed in the Frizzell case, 199 F.2d at page 157. Plaintiff's point 8 was more favorable to plaintiff than the law prescribes under these facts and reading it was harmless error.

■ 3. *The contention that the reference to dynamite established a false standard of care and duty is not supported by the record.*[56] In an effort to comply with the United States Supreme Court's holding that the duty of the employer becomes more imperative as the risk increases,[57] the charge included this language (N.T. 491):

"If a railroad employee is engaged in carrying dynamite, clearly the degree of care imposed on the railroad to give him or her à smooth passageway is higher than when he or she is carrying a light load of dirt. You will remember the uncontradicted testimony of the foreman that he told her to do light work and that she was carrying light loads. At least, that is my memory, and if my memory does not agree with yours, again, that is for you to determine.

"Reasonableness varies with the place and the danger of the work. Less diligence is required to constitute reasonable care where the danger is slight than would be required where the danger is great."

Counsel for plaintiff objected to the reference to dynamite at the end of the

---

54. This part of the charge reads as follows (N.T. 490–491):

"Even if you believe plaintiff's position that there were so many pebbles that an unsafe condition existed, you must consider, among other things, whether the defendant's foreman, Mr. Di Luzio, who was the defendant's chief representative on the scene, should have had notice of this condition, in view of the fact that only an hour, approximately, elapsed between the time work started at this location and the time of the accident and the fact that plaintiff herself admitted that all the other workmen, except the man loosening the dirt in the pile of dirt for her, were on the other side of the railroad track.

"You must decide whether this condition existed long enough so that the defendant, under all the circumstances, could be said to have failed to have used reasonable care in not removing the pebbles by sweeping or otherwise."

55. Williams v. Atlantic Coast Line R. Co., 5 Cir., 1951, 190 F.2d 744, relied on by plaintiff, involved a far more hazardous place of work than that present here.

56. Paragraph 19 of Motion for New Trial.

57. See Blair v. Baltimore & Ohio R. Co., 1945, 323 U.S. 600, 604, 65 S.Ct. 545, 89 L.Ed. 490.

charge and the trial judge used this supplementary language on this point (N.T. 529):

> "When I was referring to dynamite, of course, that was purely an example. It had nothing whatsoever to do with this case. I was just trying to illustrate the principle that the greater the danger of a particular work, the greater the burden is on the railroad. It varies according to the circumstances, of course. You can understand that, and I was just using that as an illustration. It has nothing whatsoever to do with this case."

This does not seem to the trial judge to be error.[58]

4. *The contention that the part of the charge mentioning an accidental slip is error is not supported by the law.*[59] After defining negligence, the duty of defendant to use reasonable care in furnishing its employees with a safe place to work and the burden of proof, the trial judge stated that the defendant would not be negligent "if you find that the injury resulted from an accidental slip on one of a few pebbles."[60]

The decided cases support the principle adopted by the trial judge that the question of whether an accident is unavoidable or is the result of defendant's negligence should be submitted to the jury where the evidence supports the possibility of an unavoidable accident. See El Paso Electric Co. v. Surrency, 10 Cir., 1948, 169 F.2d 444, 447; Weschler v. Buffalo & Lake Erie Traction Co., 1928, 293 Pa. 472, 476–478, 143 A. 119, 121; Springfield Township v. Indemnity Insurance Co., 1949, 361 Pa. 461, 463, 64 A.2d 761, 762.[61]

The cases cited by plaintiff[62] involve factual situations where there was no evidence to show that plaintiff's injuries resulted from any cause other than negligence. In this case, if the jury believed Mr. Di Luzio and Mr. Chiolan, there was ample evidence from which the jury could find that plaintiff's route took her across a well-paved portion of a macadam road with very few pebbles and that her injuries resulted from an unavoidable accident.[63]

D. Part of the Charge Concerning Inferences from Failure to Call some Members of Plaintiff's Section Gang as Witnesses (Paragraph 22 of Motion for New Trial).

Where potential witnesses are in court and available to both par-

---

58. In the other Federal Employers' Liability Act case tried before the trial judge at this same trial period, the charge included a similar reference to dynamite in an effort to explain how the duty of care varied with the decree of risk involved (see N.T. 373 of Copeland v. Central R. R. of New Jersey, C. A. No. 14906). No objection was made to the language by either counsel and the jury returned a verdict for $24,000. for the plaintiff.

59. Paragraph 20 of Motion for New Trial.

60. The paragraph containing this language reads as follows (N.T. 491–492):
"If you find that the injury resulted from an accidental slip on one of a few pebbles, neither the defendant nor the plaintiff could be said to be negligent, and you must find a verdict for the defendant, of course. The railroad isn't responsible for accidents. They might happen anywhere."

61. In the El Paso Electric Co. case, the court said:
"* * * * the question of whether under all the evidence the accident was unavoidable or was due to the negligence of the defendant and its agents was properly submitted to the jury."
In the Weschler case, the court said "an accident may be one for which neither party is responsible." In the Springfield Township case, the court said " 'Accident, and its synonyms casualty and misfortune, may proceed or result from negligence, or other cause known, or unknown.' "

62. See, for example, Johnson v. Macias, 5 Cir., 1952, 193 F.2d 475, 479.

63. By denying negligence, the Answer gave adequate notice of this defense. See part of Answer denying paragraph 6 of Complaint and terms of paragraph in Answer entitled "Separate Defense."

ties,[64] the failure to produce is open to an inference against both parties, the strength of the inference being up to the jury under the circumstances existing in the case. Delaware & Hudson Co. v. Nahas, 3 Cir., 1926, 14 F.2d 56, 60; United States v. Cotter, 2 Cir., 1932, 60 F.2d 689, 692, certiorari denied 1932, 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575; United States v. Beekman, 2 Cir., 1946, 155 F.2d 580, 584; Wigmore on Evidence (3rd Ed. § 288).[65] There is no requirement that the trial judge comment on these possible inferences, but he has the right to do so, pointing out such circumstances bearing on the testimony as exist in the particular case. See United States v. Cotter, supra, 60 F.2d at page 692; Century Indemnity Co. v. Arnold, 2 Cir., 1946, 153 F.2d 531, 534, certiorari denied 1946, 328 U.S. 854, 66 S.Ct. 1346, 90 L.Ed. 1626.[66]

In view of the arguments made by plaintiff's counsel to the jury concerning the failure of defendant to call the other members of plaintiff's section gang who were present in court,[67] the trial judge considered it proper to point out not only the inferences that could be drawn from failure to call these employees but also that possibly the reason these witnesses were not produced was that even the plaintiff admitted all but one of them were on the other side of the track from the place where she fell and, hence, would not have been in a position to give testimony of value.[68]

64. It is clear that a potential witness is considered equally available where he is present in court, even though the employee of one of the parties. Erie R. Co. v. Kane, 6 Cir., 1902, 118 F. 223; Iowa Central R. Co. v. Hampton E. L. & P. Co., 8 Cir., 1913, 204 F. 961; cf. Haas v. Kasnot, 1954, 377 Pa. 440, 105 A.2d 74.

65. Wigmore uses this language at Volume II, p. 171:
"* * * the more logical view is that the failure to produce is *open* to an inference *against both parties*, the particular strength of the inference against either depending on the circumstances."

66. The court said in the Nahas case, supra, 14 F.2d at page 60:
"* * * the better rule is that, the reasons for non-production of evidence being so many and various, comment thereon should be within the discretion of the trial judge who is in a far better position to determine the occasion for it, * * *."

67. The argument made by plaintiff's counsel appears as follows (N.T. 471):
"Is there any doubt about there being pebbles? There have been sitting in the back of the room other men who were there working that same day. They are are employees still on the payroll. Why didn't they call those men up here and let any one of them say there weren't pebbles? They sat here in the courtroom, and not one of those fine, honest men was called outside of the boss. Why didn't they call the others and let them say it was a good street and a good crossing and it was safe? They are here. They are under their control. They are still working for the defendant.
"The railroad company didn't dare call them. That is why. Those men would have come in and would have been just as honest as Mr. Di Luzio, who told you there were pebbles and said, 'I saw the mark myself in the street.'"

68. The language used in the charge (N.T. 494) and supplemental charge (N.T. 530–531) is as follows:
"You are entitled to consider the fact that the other railroad witnesses who were there were not produced. However, you must also remember they were in the courtroom. They were sitting back there. The railroad had them here. The plaintiff could have called them the same way he called the railroad's doctor, Dr. Cherner. They were here, and you can consider that most of them were on the other side of the track. They were not working on the same side with the plaintiff, according to her own testimony, so maybe that is why they were not produced, but that is up to you to consider. They were not produced, and they were here.
 * * * * *
"As you know, I mentioned that these employees of the railroad were in the back of the room and that they were not called as witnesses. I mentioned that because that is something which you can find, if you so desire, if you feel it is significant as a point, indicating that the defendant might have called them and didn't, and that is all there is to that, and I think that is in accordance with the arguments which were made to you by counsel."

158

In a factual situation such as this, courts have consistently recognized that no inference can be drawn from the failure to produce potential witnesses unless their testimony would be superior to that already in the record. See Wigmore on Evidence (3rd Ed.), § 287; [69] Morton v. United States, 1945, 79 U.S. App.D.C. 329, 147 F.2d 28, 31, certiorari denied, 1945, 324 U.S. 875, 65 S.Ct. 1015, 89 L.Ed. 1428; Commonwealth v. Tauza, 1930, 300 Pa. 375, 381, 150 A. 649.

It should be noted that the court specifically pointed out to the jury (N.T. 531) that "the defendant might have called (these potential witnesses) and didn't * * * and I think that is in accordance with the arguments which were made to you by counsel." Particularly since counsel for plaintiff was the only counsel to ask the jury to draw any inference from the failure of these potential witnesses to be placed on the stand, the language of the charge on this point was more favorable to the plaintiff than the above-mentioned rules of law prescribe for such a situation.[70]

E. Part of Charge Concerning Testimony of Messrs. Osborne and Chiolan (Paragraphs 23, 24 & 15 of Motion for New Trial).

At page 141 of 140 F.Supp. there is summarized the testimony of two im- partial witnesses (Mr. Osborne called by plaintiff and Mr. Chiolan called by defendant) concerning the condition of the road at the place where plaintiff fell. To recapitulate in a sentence, Mr. Osborne testified that the whole road was in bad condition and slippery and Mr. Chiolan testified that the road was in generally good condition at the place of this fall. Plaintiff contends that the charge incorrectly stated the testimony of Mr. Osborne [71] by saying that he did not know what the condition of the road was.[72] In fact, the charge stated that Mr. Osborne testified that the road was very slippery; that it had holes in it; that he had to be careful to pick his step in walking up it in April 1951; and that he estimated the road was in pretty much the same condition in November 1950, when the accident took place. On rereading the transcribed notes, it appears the charge was correct. Mr. Osborne testified that he had the road under his supervision in April 1951, not November 1950.[73] Therefore, this contention that the charge incorrectly stated this testimony is not supported by the record.

■ Plaintiff also claims that the testimony of Mr. Osborne was minimized and that of Mr. Chiolan given undue prominence. This contention is appar-

69. Wigmore states the rules as follows at pages 168 and 169 of Volume II:
"Furthermore, it seems plain that possible witnesses whose testimony is for any reason comparatively *unimportant*, or *cumulative*, or *inferior* to what is already utilized, might well be dispensed with by a party on general grounds of expense and inconvenience, without any apprehension as to the tenor of their testimony. In other words, put somewhat more strongly, there is a general limitation (*depending for its application* on the facts of each case) that the inference cannot fairly be drawn except from the non-production of witnesses whose testimony would be *superior* in respect to the fact to be proved."

70. Cases cited by plaintiff for the proposition that the plaintiff alone is entitled to have an inference drawn in his favor where employees of defendant do not testify are distinguishable on one or more of these grounds: (a) the witnesses were not in court, (b) the witnesses were in a position to give very relevant testimony not supplied by others, and (c) the witnesses, in most cases, were important employees with managerial functions (see Exhibit D-1 showing that plaintiff has been represented by her union representative in the subject of this suit, so that there is no indication that her fellow employees would be hostile to her suit).

71. Even if the charge did contain inaccurate statements of the testimony, it should be noted that it repeatedly (at least six times) stated that if any statements of the court were not in accordance with the jury's memory and understanding of the facts as testified to from the stand, such statements of the facts by the court should be disregarded (N.T. 484, 491, 492, 497, 498, 499).

72. Page 63 of plaintiff's brief.

73. N.T. 190. Mr. Osborne testified as follows at N.T. 192 on direct examination by plaintiff's counsel:

ently [74] based on the language indicating that Mr. Osborne's testimony (normally city streets were repaved only because of need) could be reconciled with Mr. Chiolan's testimony (in this case, the repaving was done at least in part due to the gift by his company of seven feet of their street frontage in order to secure a wider, paved road from which their tractor-trailers could turn into their plant south of the crossing).[75] The record supports fully this language of the charge.[76]

"And will you go on and tell us, please, what the condition of that street was as of about that time.

"Mr. Brown: If Your Honor please, my understanding is that the witness is now testifying to what happened in April of 1951, and I submit that that is not relevant.

"The Court: I understand the witness has testified that before any contract is let he inspects the street very carefully.

"The Witness: No; no, sir; not before the contract is let, sir. After the contract is let and the date to proceed is set. For instance, if we set the date as of April 1, that is the date that I go on the job.

"The Court: Oh, I see. So you did not inspect the street in November 1950?

"The Witness: No."

74. Plaintiff's brief does not explain exactly what wording constitutes this "minimizing" and "undue prominence."

75. It is well recognized that witnesses are presumed to tell the truth. Wichman v. Allis Chalmers Mfg. Co., D.C. W.D.Mo.1954, 117 F.Supp. 857, 860; The Seeandbee, 6 Cir., 1939, 102 F.2d 577, 581; 70 C.J. Witnesses, § 915. It is the province of the jury to reconcile the testimony of witnesses if this is feasible. Insurance Co. of North America v. Midwest Transfer Co. of Ill., 7 Cir., 1949, 178 F.2d 191, 193; Madden v. Mac Sim Bar Paper Co., 6 Cir., 1939, 103 F. 2d 974, 976; Anstine v. Pennsylvania R. Co., 1941, 342 Pa. 423, 429, 20 A.2d 774. In Madden case, supra, the court stated the rule as follows 103 F.2d at page 976:

"As pointed out, there were conflicts in the testimony and it was the duty of the (fact finder) to reconcile them if possible and so to determine what the truth was."

In this connection, paragraph 15 of the Motion for New Trial states "The Court erred in its charge that Dr. Farrell's testimony and Dr. Jones' testimony could be reconciled." Dr. Farrell (called by plaintiff) testified that X-ray pictures taken by him on November 9, 1955, of the left ankle show "some condition which is known medically as atrophy" and some evidence of arthritis (N.T. 138-139). Dr. Jones (called by defendant) testified that he had examined many X-ray plates (N.T. 403) of plaintiff (including those taken by Dr. Hermel on October 27, 1955, of both the right and the left ankle of plaintiff—N.T. 389-390), that "From the viewpoint of the X-rays, no, she has no atrophy" (N.T. 410), but that plaintiff had had soft tissue atrophy which was disclosed by his examination of her on October 27, 1955 (N.T. 404, 409, 409a). On cross-examination concerning the findings of Dr. Farrell, Dr. Jones testified:

"I wouldn't make any statement on a unilateral x-ray because you have to compare the opposite side for comparison purposes, because there is a great deal of variation." (N.T. 410).

In the light of this testimony, the trial judge charged that "much of the medical testimony can be reconciled, I believe, but again it is up to you" (N.T. 485). The charge continued to state, as an example of reconciling the testimony of witnesses, that Dr. Jones testified that he was unable "to rely on Dr. Farrell's testimony because Dr. Farrell's x-rays had only been of the left foot, and unless you took x-rays of both the left and the right foot and could compare the two of them, you would get an inaccurate opinion in certain circumstances. It is up to you to see whether you can reconcile those two and whether this reason for the difference which Dr. Jones explained was a reasonable reason for a difference or whether you believe Dr. Farrell and don't believe Dr. Jones or you don't believe either of them. That is up to you, but you must consider the testimony and decide whether you can reconcile it, fit it together into a pattern, or whether you can't." (N.T. 486). The trial judge believes that this portion of the charge, when read as a whole, is in accordance with the rules of law stated above.

76. The charge does not review the testimony of Mr. Chiolan that his company dedicated to the city seven feet in width

The summary of Mr. Chiolan's testimony in the charge was factually accurate. Less space was devoted to Mr. Chiolan's testimony than to Mr. Osborne's testimony in the charge, so it is difficult to see the basis for the claim of "undue prominence."

F. Parts of Charge Concerning Statement Obtained From Plaintiff and the Mere Fact That Damages Were Covered Did Not Indicate Liability (Paragraphs 21 and 35 of Motion For New Trial).

Counsel for plaintiff contends that the summary of plaintiff's testimony on liability in the charge (N.T. 492–493) disparaged the plaintiff and her case. The court has reread her testimony and the testimony (Exhibit D–1) she gave at the hearing in January 1951, two months after the accident. The charge seems accurate and not disparaging.[77]

Complaint is also made that the language of the charge improperly repeats "over and over again" that the mere fact that the court charged on the subject of damages "was not to create the impression that the court was in favor of damages or that there was liability." The charge did not use the above-quoted language employed by plaintiff and in only two places said that the mere fact that the charge covered damages is not to be taken as an indication of the trial judge's views on the question of liability. The record does not support either plaintiff's contention that this language was repeated "over and over again"[78] or her contention that this language inferred that the court thought no damages should be awarded.[79]

---

along their entire road frontage and agreed to do the necessary paving and curbing in return for this repaving of a road which needed improving (N.T. 350). Because of a difference of opinion at the argument on this motion for new trial as to the contents of letters from Mr. Chiolan's file, used by counsel for plaintiff in cross-examining him but not offered in evidence, it was agreed that copies of these letters would be submitted to the trial judge. The letter of October 20, 1950, supports Mr. Chiolan's testimony concerning the widening of the road south of the crossing by seven feet. Copies of these letters of August 9, 1950, October 20, 1950, and November 16, 1950, have been placed in the Clerk's file.

Also, it is noted that this paragraph of the charge leaves the question up to the jury by concluding (N.T. 495):

"It is up to you as to whether you think that possible conflict is important."

77. For example, it does not even point out, much less emphasize, that the plaintiff stated in January 1951 that the surface of the street was dry and frozen without mentioning pebbles (page 2 of Exhibit D–1) and that she was silent when her foreman testified at that hearing that the street was "free of loose stones and dirt." See page 3 of Exhibit D–1. She was asked at the end of this hearing, after her foreman had testified, whether she had any more to say and she said "No" (see page 5 of Exhibit D–1). The trial judge was considerate of plaintiff throughout the trial; for example, not requiring her to rise when sworn (N.T. 32) and permitting her to testify without resuming the witness stand when called back for examination as a witness by defendant (N.T. 212). The summary of plaintiff's testimony also does not point out that she was carrying an empty shovel without any dirt on it when she fell.

78. As pointed out by the court in Palmer v. Miller, supra, at page 931, " * * * we know of no federal rule which limits the number of times that that truth, or any other truth, may be restated by a federal judge in a charge which on the whole is accurate and fair."

79. In the concluding part of the charge, the court said, at page 530: " * * * nothing I said should be allowed to make you feel that the plaintiff had not sustained her burden of proving this case or that she had. That is for you to decide. That is your problem. All I can tell you is the law, which is that the defendant has the duty to use reasonable care and to provide this plaintiff with a reasonably safe place to work under all the circumstances."

G. Part of Charge Alleged to State That Plaintiff Was Guilty of Contributory Negligence As a Matter of Law in Not Putting Weight on Her Foot (Paragraph 28 of Motion for New Trial).

Plaintiff apparently contends that the first paragraph on page 497 contains the alleged objectionable language.[80] However, this language does not even mention the word "negligence." Furthermore, the trial judge only mentioned the subject of contributory negligence in the charge at the suggestion of counsel for plaintiff [81] who said "I am just trying to avoid any suggestion that you withdrew any issue from the jury * * *. I would rather not give any possible room for argument." The contention that the language on page 497 was an inaccurate statement of facts will be covered by H below and Exhibit A.

H. Parts of Charge Concerning Damages (Paragraphs 29 to 34 of Motion for New Trial).

As pointed out above (II–A),[82] any errors in connection with that part of the trial relating to damages were made harmless by the verdict of the jury in favor of the defendant. In accordance with this legal principle, it has been consistently held that any errors in a charge which concern the damages are not ground for reversal where the jury returns a general verdict for defendant or makes a special finding of no liability. See Blanton v. Great Atlantic & Pacific Tea Co., 5 Cir., 1932, 61 F.2d 427, 429; Bryne v. Greene, 1 Cir., 1934, 70 F.2d 137, 139; Dupont v. Gallagher, 1948, 360 Pa. 419, 423, 62 A.2d 28; Goldstein v. Aronson, 1950, 365 Pa. 435, 438, 76 A.2d 217.[83] An examination of the subjects of the above paragraphs of the Motion for New Trial indicates that they contain no reversible error, if any error at all. In view of the length of this opinion, a brief comment on these paragraphs will not be included here but will be attached to this Opinion and Order as Exhibit A.

I. Contention That Charge Was Prejudiced and Prejudicially Inaccurate (Paragraphs 7, 8 and 12–14 of Motion for New Trial).

This allegation that the trial judge was not impartial in the charge [84] is based on the contention that he committed error in the matters covered by Sections A to H of Part III of this Opinion.[85] For the reasons given in this Part III, the trial judge does not believe the charge contains reversible error.[86]

---

80. As pointed out in Exhibit A, the statements of law contained in this paragraph are based on the Restatement of Torts.

81. The court informed counsel that he was going to instruct the jury not to consider contributory negligence, as he did not believe there was enough evidence of such negligence to justify a charge on this subject (N.T. 478–479).

82. See pages 17 to 20 above.

83. For similar decisions in other jurisdictions, see American Creosote Works v. Rose Bros., 1951, 211 Miss. 173, 51 So. 2d 220; Janvrin v. Broe, 1949, 239 Iowa 977, 33 N.W.2d 427; Kuhn v. Watertown Cement Products Co., S.D.1955, 68 N.W.2d 241; Rogers v. City of Detroit, 1954, 340 Mich. 291, 65 N.W.2d 848. This rule would not apply if the errors permeated the entire charge, but these paragraphs relate to matters covered only in that portion of the charge related to damages, which portion the jury was instructed to disregard if they found the defendant was not liable (N.T. 495–496).

84. Pages 53 to 60 of plaintiff's brief.

85. There seems to be no benefit to be gained from lengthening this opinion with answers to all of plaintiff's contentions. For example, plaintiff objects that the possible interest of the plaintiff was referred to "without referring to the fact that there were officers, other employees and other persons called by the defendant—who likewise have such interest" (N.T. 516). The language of the charge at pages 486–487 reads as follows:

"You may feel that in addition to the interest of the plaintiff, some of the employees of the Reading Company, because of their working for the Reading Company, had an interest, and that you should discount their testimony on that ground. That is up to you."

86. A few examples of matters in which the charge was more favorable to plaintiff than defendant are:

The following statements of the appellate courts seem appropriate:

"Finally, the appellant presses the argument that the charge as a whole is slanted in favor of the plaintiff. This is a matter of judgment. We could hardly expect one who has lost a lawsuit to look at it from the same point of view as the victor." Robak v. Pennsylvania R. Co., 3 Cir., 1949, 178 F.2d 485, 487.

"Appellant complains that the court below unduly stressed appellee's testimony. The charge was a correct résumé of all the evidence, and we may consider only the record before us. Appellant's misfortune is that the evidence exhibited a much stronger case for defendant than for plaintiff, and, if it created an impression in defendant's favor, it was because the testimony warranted it." Gallagher v. Hildebrand, 1926, 285 Pa. 350, 352, 132 A. 174.

A reading of the last three pages of the charge, together with the charge as a whole, indicates to the trial judge that the jury was impartially advised of the issues for their decision. Because of the failure of counsel for plaintiff to submit requests for charge within the time required by the Rules and his failure to furnish any written trial brief, it is not reasonable to object that the trial judge was not more expert in presenting plaintiff's contentions to the jury. The court can find no error in those parts of the defendant's requests for charge which were read to the jury.[87]

Exhibit A to Opinion of March 16, 1956.

I. Contention that charge erroneously stated that plaintiff did not put weight on her foot and was unreasonable in not doing so (Paragraphs 29, 33 & 34 of Motion for New Trial).

■ The record makes clear that from time to time during the time since plaintiff's fall on November 27, 1950, she used casts, braces, crutches, and restrictive bandages, thereby taking weight off her foot. At certain times her failure to place weight on her foot was recommended by doctors, but at other times this was contrary to the advice of certain doctors (see testimony referred to at page 142 of 140 F.Supp. Plaintiff did not testify that she followed the doctors' advice in putting more and more weight on her foot, but that she tried it and could not do it because "it was hurting."[1] The charge did not say at any point that plaintiff did not have good cause to refuse to put weight on her foot or that she was unreasonable in not putting weight on her foot. This decision was left to the jury under language based on the Restatement of Torts, § 918(1) and Comment (e).[2] Cf. Murphy v. American Barge

(a) The charge never pointed out that plaintiff was walking with an empty shovel when she fell.

(b) The court gratuitously pointed out, after reading plaintiff's 8th request for charge: "Mr. Di Luzio admitted that after the accident he saw loose pebbles and stones in the immediate vicinity where the plaintiff fell."

(c) As pointed out above under III–B, the charge specifically stated that the failure to call the other members of the plaintiff's section gang could be the basis of an inference against defendant in accordance with the argument of counsel (plaintiff's counsel, as he was the only one who had based an argument on this point—see footnote 67), thereby adopting the language of plaintiff's closing speech on this point.

(d) The charge did not comment on the testimony that on March 24, 1953, a doctor treating plaintiff made an entry in her medical report that her "demeanor and story make me feel that ASA grains 10 (a form of aspirin pill) will help this patient as much as anything" (N.T. 162–163).

87. Paragraph 37 of Motion for New Trial.

1. N.T. 62. At page 66, she said of the doctors: "They wasn't doing nothing." At page 73, she said that the doctors "didn't pay me no attention."

2. See N.T. 497, 500–501 and 501–502, where this language was used:

Line Co., 3 Cir., 1948, 169 F.2d 61, 64; Lewis v. Pennsylvania R. Co., D.C.E.D. Pa.1951, 100 F.Supp. 291, 294; Feathersmith v. United States, D.C.E.D.Pa.1952, 104 F.Supp. 226, 229–230. Also, the charge did not state that a person has a duty to suffer pain.

II. Contention that it was erroneous to say that Dr. Wolcott agreed with the other doctors in believing there was no need for an open reduction operation (Paragraph 30 of Motion for New Trial).

A reading of Exhibit P–11 [3] and consideration of the testimony on this point indicates to the trial judge that, after considering new X-rays, as well as X-rays taken at Jefferson Hospital, Dr. Wolcott did not want to perform an open reduction operation as of 8/21/51, even though he believed the bone was not entirely healed. See N.T. 313–314.[4] Even if the trial judge was incorrect, the charge emphasized that the trial judge's memory on this point might be different from that of the jury and that the jury might remember some evidence that the judge had overlooked.[5] There is no evidence in the record that plaintiff was unable to produce Dr. Wolcott as a witness, so that any confusion in the record on this point, which was introduced into the case by plaintiff, is her responsibility. Under such circumstances the charge does not contain reversible error in this respect.

III. Contention that it was error to draw an inference from the fact that plaintiff failed to call Dr. Wolcott and Dr. Lockman (Paragraph 31 of Motion for New Trial).

On the issue of damages, one of defendant's main contentions was that plaintiff had been physically able to return to work on July 31, 1951. One of plaintiff's contentions was that Dr. Wolcott, of the Women's Medical College Hospital, had believed it was advisable to perform an open reduction operation on plaintiff in August 1951 and, hence, plaintiff could not have been fit for the strenuous work of a track laborer on

---

"There would be no recovery for this if you believe the plaintiff was unreasonable in trying to rehabilitate her leg through using it and that she was able to work in July 1951. If she has co-operated in trying to get well but has not recovered, even though her doctors were not good doctors, that is not her fault, and then her recovery for this second item of damages would vary from $23,000 to $27,800, * * *.
\* \* \* \* \*
"* * * you must give her something for pain and suffering, because she did have very real pain, very real suffering, very real inconvenience during this period, and it is admitted by everybody that this business of putting weight on a broken ankle is painful, it hurts to get it well. On the other hand, a person has a duty to get it well, has a duty to try to cooperate and reduce the amount of damage."

3. See the last sentence of the first paragraph of this communication of August 22, 1951.

4. The following testimony appears at N.T. 314:
"Q. Dr. Cherner, as a result of your department's conversation with Dr. Vas-

tine of the Women's College Hospital, was it or was it not concluded that this woman was able to use her left ankle or foot without having any such operation? A. It was."

5. The language of the charge at N.T. 497–498 is as follows:
"* * * in July 1951, Dr. Wolcott felt that an open reduction operation would be desirable because the plaintiff complained of pain preventing her from working. In the letter of August 22, as a result of x-rays, and a typographical error in a previous report, he changed his position and stated that he would not perform an operation.
"Now, this is my memory of the testimony and yours may be different. Dr. Wolcott's position in wanting to do an open reduction was changed as a result of the stand taken by doctors employed by the Reading Company, but I can remember nothing in the record that indicates that his mind was not completely changed by the opinions of the doctors. However, counsel for plaintiff has argued to you that Dr. Wolcott was prevented from doing this operation by the Reading Company doctors, and you may remember some evidence on this which I have overlooked."

July 31, 1951. As pointed out above under part II of this Exhibit A, the plaintiff produced the testimony concerning Dr. Wolcott's views on such an operation from the defendant's medical records, but the testimony and Exhibit on this point do not make crystal clear what Dr. Wolcott's ultimate view concerning this operation was. Under these circumstances, Dr. Wolcott was very familiar with a relevant fact, that is the physical condition of plaintiff's left leg and ankle in the summer of 1951, and there was no showing that he was unavailable as a witness.

Another contention of defendant was that plaintiff's present condition resulted from disuse of her muscles caused by using tight bandages, crutches, a brace, etc., keeping her ankle from getting exercise. During the trial, plaintiff's counsel also brought out by having a witness testify from the medical records of the Philadelphia General Hospital that Dr. Lockman of that hospital had treated plaintiff in 1952 and recommended that she wear a brace. Hence, Dr. Lockman was familiar with plaintiff's physical condition in 1952 and there was no showing that he was unavailable as a witness.

■ The applicable rule of law in such cases is that where witnesses familiar with the facts are available and not produced on the stand, the jury is entitled to infer that their testimony would be unfavorable to the cause of the party whose interest it is to establish the facts with which the witnesses are familiar. See United States v. Grannis, 4 Cir., 1949, 172 F.2d 507, certiorari denied 1949, 337 U.S. 918, 69 S.Ct. 1160, 93 L.Ed. 1727; Wigmore on Evidence (3rd Ed.), § 285.

■■ In view of the above facts, this language of the charge is no more favorable to the defendant than the trial judge was required to give under the above-mentioned rule of law (N.T. 498–499):

"In this connection, you are entitled to take into consideration plaintiff's failure to produce as a witness Dr. Wolcott, to whom she referred so often during this case, and Dr. Wolcott was never here in court. Dr. Lockman was never here in court, and those were the doctors who treated this plaintiff during this early period when the Reading Company says that they gave her a return-to-work slip, that she was perfectly able to return to work, and their doctors say there was a complete union, and they say that she kept using Ace bandages and other supports which did not put the proper weight on the ankle in order to permit its recovery."

In view of the references to these doctors in the arguments of counsel (N.T. 442–444, 466–467, & 472–473), an instruction on this subject was necessary and proper.

IV. Contention that it was error to point out that Dr. Bonner never saw records of Women's Medical College Hospital (Paragraph 32 of Motion for New Trial).

■ Plaintiff's counsel called Dr. Bonner, who testified that he examined her on November 9, 1955, when he made the diagnosis described at page 142 of 140 F.Supp. Also, Dr. Bonner testified that plaintiff was using a crutch and cane, during the period since her fall on 11/27/50, under doctor's orders, even though he had only seen the records of the Philadelphia General Hospital and the Temple University Hospital beginning in January 1952 and had not seen the records of the Women's Medical College Hospital (N.T. 186), where plaintiff was treated until the end of 1951 (N.T. 172 and 174–176). Furthermore, it was as of July 31, 1951, that defendant's doctors believed plaintiff had made a sufficient recovery to resume her job as a track laborer. Under these circumstances, the trial judge felt it was his duty to point out in the charge that Dr. Bonner saw none of the 1951 records when plaintiff was treated at the Women's Medical College Hospital (N. T. 499).