James ROMER, an infant, by his next friend, John Romer,

and

John Romer and Mary Romer

v.

Claude Rodgers BALDWIN

and

Smith's Transfer Corporation of Staunton, Virginia.

Civ. A. No. 25467.

United States District Court
E. D. Pennsylvania.

July 19, 1962.

Theodore R. Mann, Philadelphia, Pa., for plaintiff.

George P. Williams, III, and Edward C. German, Philadelphia, Pa., for defendants.

VAN DUSEN, District Judge.

This case is before the court on plaintiffs' Motions to set aside the verdict and judgment entered thereon and to grant a new trial on both the questions of liability and damages, after the jury returned a special verdict for defendants on the issue of liability and, under the directions of the trial judge, made a special finding of damages for the plaintiffs in the amounts of $31,284.00 for Mr. and

Mrs. John Romer and $16,700.00 for minor plaintiff, James Romer.[1]

The plaintiffs based their Complaint for personal injuries on the allegation that the individual defendant (Baldwin, who was acting for the corporate defendant) negligently drove a tractor-trailer motor vehicle (owned by the corporate defendant) against and over minor plaintiff, who was then crossing the highway at or near the intersection of Richmond Street and Castor Avenue, in Philadelphia, Pa., on October 8, 1958.

## FACTS

The accident in question occurred near the intersection of Castor Avenue and Richmond Street in Philadelphia at about noon on October 8, 1958. Castor Avenue is a main traffic artery fifty feet wide and Richmond Street is also a heavily traveled highway thirty-four feet wide (Exhibit P–10). During the trial, it was considered that Richmond Street runs north and south and that Castor Avenue runs east and west. On the day of the accident, the weather was clear and the streets were dry.

Minor plaintiff was one of a group of five boys, ranging from 5 to 12 years of age, who had been standing on the southwest corner of the intersection for about five minutes before the accident. The boys were talking over what they were going to do that day while they waited for the return of another boy, who was taking his bicycle home.

Defendant Baldwin was completing a trip from Staunton, Virginia, to defendant Smith's terminal building located on the east side of Richmond Street, south of the intersection (Exhibit P–10, N.T. 137). Baldwin put his right turn signal on when he was about one-half block west of the intersection and he came to a stop on Castor Avenue for a red traffic light, with the front of his tractor-trailer about 28 or 29 feet west of the curb line of Richmond Street. Baldwin's truck had an overall length of 44½ feet.

As Baldwin's truck was in the process of making a right turn around the southwest corner from Castor Avenue so as to proceed south on Richmond Street, minor plaintiff was injured by a left, inside, rear wheel of the trailer when he ran out, in an easterly direction, into Richmond Street while looking in the direction of the northwest corner of the intersection.

---

1. Special Questions 1–3 (Document No. 31) read as follows:

"1. Was Claude R. Baldwin, the driver of the tractor-trailer, rig, negligent?

Yes or No    No

If you answer this question 'yes,' please answer the remaining questions, except do not answer question 5 if you answer question 4 'no.' If you answer this question 'no,' please answer question 3 only.

"2. Was any negligence you have found in answering question 1 'yes' a substantial factor in causing the accident?

Yes or No ————

"3. What were the damages suffered by

A. Mr. and Mrs. John Romer
[past ($18,765.35, see Exhibit A) and future, until their son James is 21, expenses and loss of earnings, if any, by James prior to his becoming 21, reduced to present worth]    $31,284.00

B. James Romer
[medical expenses after 21, loss of earnings, if any, after 21, reduced to present worth, and past and future pain, suffering, injury and inconvenience]    $16,700.00"

The jury was asked to answer question 3 even though question 1 was answered "no" for these reasons:

A. In the event of a new trial on the liability issue, it would not be necessary to take court time for a repetition of the extensive medical testimony.

B. Plaintiffs' settlement demands were so different from the estimate of the trial judge that the trial judge hoped a jury damage verdict might lead to settlement, even though plaintiffs' counsel would otherwise litigate his claimed right to a directed verdict on the negligence issue if the jury returned a negative answer to question 1. See discussion of 75 P.S. § 1012(a) below at pp. 7 & 8.

However, plaintiffs are dissatisfied with the jury's answer to question 3, as well as to the answer to question 1.

While he was stopped for the traffic light, Baldwin saw the group of boys on the southwest corner and he observed that they were milling around and playing together. When the light changed to green, Baldwin proceeded straight forward until the front of his tractor got to the center line of Richmond Street, a distance of 45 or 46 feet. During that forward movement, Baldwin watched the group of boys and none of them moved from the sidewalk. When he arrived at the center of Richmond Street, Baldwin continued to look at the boys and he observed that all of them were still standing on the sidewalk. Baldwin then turned his wheels to the right and proceeded into Richmond Street. As Baldwin made his turn, he continued to watch the boys out of the right window of his cab until he got either "about even with them" or until he got "about 10 feet past them." None of the boys had left the sidewalk by the time Baldwin had arrived at this point in his turn. Immediately before he started the eastwardly movement which resulted in the accident, it was stipulated that minor plaintiff, if called to the stand, would have testified that he was standing just to the south of a traffic light standard on the southwest corner at a point so close to the light standard that he could have touched it with his left hand.[2] This traffic light standard is 8 feet 6 inches south of the south curb of Castor Avenue (Exhibit P–10). Baldwin's speed from the time he started up after the traffic light changed to green for Castor Avenue traffic until he stopped his vehicle after the accident did not exceed 5 or 6 m. p. h.

Baldwin did not blow his horn at any point during his turn from Castor Avenue into Richmond Street. The noise from the diesel engine of his vehicle as he started his truck moving east on Castor Avenue was so loud that it could have been heard in front of Smith's terminal building, located over 200 feet south of the intersection.

After the accident, minor plaintiff was found beneath the left, rear wheels of the trailer. The investigating police officer, who arrived on the scene a few minutes after the accident, found a blood spot which measured approximately 4 feet (north-south) by 8 inches (east-west) (N.T. 109). The center of this spot was 12 feet east of the west curb of Richmond Street and 18 feet south of the south curb of Castor Avenue.

## I. The record justifies the finding that the plaintiffs failed to prove that Baldwin was negligent.

■ The record provides ample support for the jury's finding that Baldwin had exercised that degree of caution and prudence required of a driver properly mindful of the safety of children playing on the nearby sidewalk. The jury may well have considered and found that:

(1) Baldwin maintained an adequate lookout, as evidenced by the fact that he kept the group of boys under constant observation as he rounded the corner;

(2) Baldwin proceeded at a proper rate of speed, as evidenced by the fact that his speed was 5–6 m. p. h. at the time of the accident;

(3) Baldwin did not have to stop in the center of Richmond Street before commencing to turn to the right;

(4) Baldwin had his tractor-trailer under adequate control during this turn;

(5) the children would not be affected by the movement, since they were playing and not waiting to cross the street at the time of the change in color of the traffic light; and

(6) the noise involved in starting this loaded tractor-trailer from a stopped position at the light made any sounding of the horn unnecessary.

Since the jury returned a verdict for defendants, plaintiffs have contended that the trial judge should have instructed the jury that Baldwin was negligent as a

---

**2.** All counsel stipulated that Jimmy was "so close to it (traffic light standard) that if he had reached out with his left hand he could have touched it" (N. T. 582).

matter of law. This contention is rejected for these reasons:

A. An instruction that Baldwin was negligent as a matter of law would have been error on this record.

As pointed out above, the jury was justified in making the finding in (5) above. Under such circumstances, there was no violation of the following provision of the Pennsylvania Motor Vehicle Code (75 P.S. § 1012(a)) relied on by plaintiffs:

"(a) The driver of any vehicle upon a highway, before starting, stopping or turning from a direct line, shall first see that such movement can be made in safety, and, if any pedestrian *may be affected* by such movement, shall give a clearly audible signal by sounding the horn, and whenever the operation of any other vehicle approaching or following may be affected by such movement, shall give a signal, as required in this section, plainly visible to the driver of such other vehicle of the intention to make such movement." (Emphasis supplied.)

██ The Pennsylvania courts have consistently indicated that this provision does not lay down a mandatory requirement that vehicle operators making a right-hand turn must sound their horns at all events, regardless of the circumstances confronting them on any given occasion. In Piper v. Adams Express Co., 270 Pa. 54, at pages 57–58, 113 A. 562, at page 564 (1921), the court said:

"Section 13, of the Act of July 7, 1913 (P.L. 672, 679), provides that every operator of a motor vehicle shall give reasonable warning of his approach by horn, bell, or other signal 'whenever necessary to insure the safety of other users of the highways.' This provision is merely a statutory enactment of the duty imposed by the common law upon the driver of every such vehicle. Whether a necessity for signal exists in a particular case must depend upon the circumstances."

See, also, Greger v. Hollis, 61 Montg. Co. L.R. 77, 79 (1944).

Plaintiffs' evidence indicates that:

(1) Baldwin saw the children at the intersection as he stopped in Castor Avenue, waiting for the light to change;

(2) none of the boys, including minor plaintiff, left the sidewalk at any time while Baldwin proceeded from his stopped position 45 or 46 feet in an easterly direction until he reached the center of Richmond Street; and

(3) none of the boys left the sidewalk while Baldwin proceeded south on Richmond and until he reached a point where his body, sitting in the tractor, was "about even" with the group of boys.

██ Defendants' evidence indicates that Baldwin was south of the minor plaintiff when he ran out into the street. The evidence justifies the finding that Baldwin had no reason to suppose minor plaintiff might have been affected by Baldwin's movement around the corner. On this record, Baldwin had no duty to blow his horn under the precise set of circumstances which confronted him. Baldwin had no reason to suppose that any of the children would suddenly dart out into the street after his turn had virtually been completed.

Silberstein v. Showell, Fryer & Co., 267 Pa. 298, 109 A. 701 (1920), relied on by plaintiff, regarding the anticipation by a driver of heedless, thoughtless and capricious acts of immature children, does not justify a direction to the jury that Baldwin was negligent on this record.

B. Plaintiffs did not request this instruction in their points for charge or at the end of the charge.

██ The record required the denial of paragraph 15 of plaintiffs' points for charge (Document No. 32) because it stated as facts certain matters which the jury was not required to find from the evidence. For example, it stated that the driver intended "to turn in front of (the children) as was the case here." The evidence does not make clear whether all or some of the children were facing north

or were facing east. If they were facing north, as the minor plaintiff was according to the testimony of Kucinski (N.T. 59–60), the truck would have passed in front of them before making a turn.[3] At no time, either before or during the charge, did plaintiffs' counsel request a charge stating that "assuming you find certain facts, then the defendants must be found to have been negligent as a matter of law."

■ Since a violation of the Motor Vehicle Code is not a basis for liability unless such a violation was a proximate cause of the accident,[4] paragraph 16 of plaintiffs' points for charge (Document No. 32) was erroneous. There was ample evidence from which the jury could have found that the accident would have happened precisely as it did whether or not Baldwin had blown his horn during the turn.

## II. *Alleged errors of the trial judge*

In view of plaintiffs' briefs, comment on the following alleged errors of the trial judge may be helpful:

A. Admissibility of Exhibits P–9, P–11C and parts of deposition of Baldwin (N.T. 206–7) and language in charge on effect of prior *inconsistent statements*.

Kucinski, a witness called by plaintiffs, testified that the minor plaintiff ran into the right front fender of the tractor (N.T. 33–34). On cross-examination, Kucinski was asked whether he did not tell the investigating police officer on the afternoon of the day of the accident that he saw the minor plaintiff "run out into the street and into the rear wheels

of the tractor, and then went under the trailer * * *" (N.T. 62). He denied making such a statement. He also denied having said to an investigator about a month before the trial that the minor plaintiff ran into the side of the trailer (N.T. 64). Subsequently, the following cross-examination took place at N.T. 68:

"Q And didn't you tell that investigator that day, a few days after the accident, that Jimmy had gone under the trailer just behind the dolly wheels?

"A No, sir. I remember not saying anything like that.

"Q Did you tell the man who came to your house a month ago that you had told that to the investigator?

"A No.

"Q Did you tell the man who came to your house about a month ago that this investigator who took you to the scene of the accident a few days after the accident happened wouldn't let you out of the car until you signed a statement saying that Jimmy struck the right front fender?

"A Well, not exactly that. See—

"Q What did you tell him on that subject?

"A When we got back from the accident, my mother, she wanted to read over the statement that I had made to him before I signed anything to it.

"Q Right.

"A Well, he said he didn't have enough time to come in the house, and he left a few blank spaces in the

---

3. It is unnecessary to point out all respects in which the facts as stated in this point for charge differed from the facts as the jury was entitled to find them from this record. For example, the evidence did not require a finding that the children, including minor plaintiff, did not see the truck before he came to the intersection or that he approached them from the rear. The only recollection that the driver had of the position of the children prior to his making

the turn was at N. T. 166, where he stated he did not remember what direction they were facing and that "They were milling around playing with each other."

4. Byrne v. Matczak, 254 F.2d 525, 528 (3rd Cir. 1958); Nunamaker v. New Alexandria Bus Co., Inc., 371 Pa. 28, 35, 88 A.2d 697 (1952); Restatement of Torts, §§ 431–433.

paper. He said he would fill them in later."

On redirect examination, plaintiffs' counsel produced the statement with blank spaces (P–9) and made the following offer out of the presence of the jury (N. T. 96):

"Mr. MANN: I intend, first of all, to have the explanation that he just gave to Your Honor outside of the presence of the jury regarding the blank spaces made in the presence of the jury, and I intend to read him this statement and ask him whether this is the statement that he signed in the presence of the jury. They are my two offers, sir.

"THE COURT: Very well. I will let you ask him about the blank spaces * * * —or what he meant by 'blank spaces,' and I will let you ask him whether, to the best of his recollection that is the statement, but I will not let you read it to them or go into the contents of the statement."

■ At this point, there was no showing of an inconsistent statement by the witness, as he had denied ever making any inconsistent statement, so that it was improper to permit the counsel who had called him to show a prior consistent statement. As pointed out below, the investigating police officer testified that this witness made a prior inconsistent statement later in the trial, but there was no inconsistency justifying rehabilitation of this witness of plaintiffs at this point in the trial. Counsel for plaintiffs never recalled Kucinski and examined him on the basis of the contents of P–9 after the testimony of the police officer, so that defendants' counsel never had an opportunity to cross-examine Kucinski on such contents. After all the testimony had been produced, plaintiffs' counsel offered P–9 in evidence (N.T. 925–6), but such offer had to be rejected in view of the lack of opportunity for cross-examination.

The investigating police officer produced a report by him of an interview with this witness within a few days of the accident in which Kucinski is stated to have said he " * * * saw Jimmy run out into the street into the rear wheels of the tractor" (see Exhibit P–11C and N.T. 118–9). This part of the report was received in evidence as a prior inconsistent statement of the witness at the same time other parts of the report (P–11A and P–11B) were received in evidence at the request of plaintiffs (N.T. 929–930).

■ The trial judge instructed the jury that Baldwin's (defendant-driver's) prior inconsistent statements were affirmative evidence but that Kucinski's statement to the police officer was not affirmative evidence and had only the limited effect " * * * if you (the jury) accept it, if you believe that John's testimony was correct when he talked to the police officer right after the accident rather than what he said here * * *." (emphasis supplied), of cancelling out Kucinski's testimony as to the point of contact between minor plaintiff and the vehicle (N.T. 1129–1130, 1181–2).[5]

This portion of the charge is in accord with the Pennsylvania rules of evidence. See Geiger v. Schneyer, 398 Pa. 69, at page 73, 157 A.2d 56, at page 58 (1959), where the court stated that " * * * the evidentiary function of a prior inconsistent statement by a *witness who is not a party* is limited to impeaching the testimony given by the witness at trial and has *no substantive value*. Evidence of a prior inconsistent statement *by a party*, however, may be used not only to impeach his testimony at the trial but also is substantive proof of the matter contained therein." (Emphasis supplied). This is also the rule of this

5. At pp. 1–5 of their brief, plaintiffs have ignored several portions of the charge on the effect of this prior inconsistent statement, including the many places where the trial judge emphasized that it was solely for the jury to determine the facts and to accept or reject the testimony of such witnesses as the police officer. N. T. 1124, 1125, 1126 & 1181.

court. See United States v. Biener, 52 F.Supp. 54, 56 (E.D.Pa. 1943).

■ As stated in 2 Henry, Pennsylvania Evidence, 167 (§ 733), "It is a general rule in both civil and criminal cases that all books, papers, documents, maps, photographs or other exhibits regularly received in evidence may be sent out with the jury." See, also , Quartz v. Pittsburgh, 340 Pa. 277, 279, 16 A.2d 400 (1940), where the court said:

"* * *, the rule is well established that, while documentary exhibits ordinarily should be sent out with the jury unless there is some special reason to the contrary, the matter is one largely within the discretion of the trial judge: * * *."

Cf. Durdella v. Trenton-Philadelphia Coach Co., 349 Pa. 482, at 483 & 484, 37 A.2d 481 (1944). There was no special reason why Exhibit P–11C, regularly received in evidence, should not have been sent out to the jury under proper instructions of the trial judge in view of the above authorities.

B. Contention that alleged inconsistent statements made by the defendant-driver in a trial deposition, which were read to him during the trial (N.T. 206–9), should have been typed and sent out to the jury as an exhibit.

■ It has been the usual practice to send out to the jury signed statements, and, under proper circumstances, unsigned statements, made nearer to the time of the accident than the time of trial,[6] but it has not been the practice of this court to send out parts of pre-trial depositions, on the basis of which parties have been cross-examined, since such parts are read in the presence of the jury. There was no error justifying a new trial, (see F.R.Civ.P. rule 51, 28 U.S.C.A.) in refusing to start a precedent in this case of having counsel focus the attention of the jury on a discovery deposition, as opposed to the testimony given by a party

in court. Cf. Zank v. West Penn Power Co., 169 Pa.Super. 164, 167, 82 A.2d 554 (1951).

As to plaintiffs' objection that the statements made by the driver at his deposition were not summarized to the jury during the charge, the trial judge stated clearly to the jury that he had not gone over all the testimony in his charge. Within the last two pages of the court's charge, the following appears (N.T. 1180):

"* * * I want to emphasize that I have not begun to go over all the testimony. I just pointed out a few things in order to make points clear. You must, of course, consider all the testimony in deciding any point."

C. The trial judge did not err in allowing defendants to cross-examine Kucinski on his oral statement prior to the trial that "the truck driver was not at fault" and to argue Kucinski's affirmative response to the jury.

■ On direct examination, plaintiffs' witness, John Kucinski testified that minor plaintiff contacted Baldwin's truck on the right front fender of the tractor (N.T. 35) and the trial judge admitted, as a prior recollection recorded Kucinski's statement in his pre-trial deposition that plaintiff was standing on the white line of the crosswalk at the time he came in contact with the truck (N.T. 44–45). On cross-examination (N.T. 70), Kucinski was asked:

"Didn't you tell the man that came out to see you the other night about a month ago at your home and talked to you with your mother that in this accident the truck driver was not at fault?"

He answered, "Yes, Sir."

After an objection, Kucinski volunteered:

"But we also said that nobody was really at fault. I mean, that is what we all concluded."

---

6. See, for example, Shane v. Warner Mfg. Corp., 229 F.2d 207, 210 (3rd Cir. 1956);

cf. Tridell v. Munhall, 124 F. 802, 803 (C.C.Pa.1903).

Plaintiffs contend the trial judge should have granted plaintiffs' motion for the withdrawal of a juror (N.T. 97). The trial judge offered to instruct the jury to disregard this volunteered statement, but counsel for plaintiffs (N.T. 605–9) requested the court not to do so. It is noted that defense counsel was instructed not to refer to this volunteered statement in his closing argument (N.T. 605–9), and he complied with that direction of the court.

Kucinski's testimony on direct, if believed, supports an inference that plaintiff was in a position visible to the truck driver and, perhaps, in the truck driver's line of vision. This is inconsistent with Kucinski's prior statement about a month before the trial. The trial judge pointed out to counsel on two occasions, while Kucinski was still on the stand, that either party could question him on what he meant by "fault" (N.T. 70 and 97). The assertion that "the truck driver was not at fault" is partly a statement of opinion and partly a statement of fact. Such evidence is admissible in Pennsylvania. See Beardsley v. Weaver, 402 Pa. 130, 166 A.2d 529 (1961), and 3 Wigmore, Evidence, § 1041 (3rd Ed.1960).

There was no reversible error in allowing defendants to cross-examine Kucinski on the basis of his before-trial statement that Baldwin "was not at fault," and to refer to that testimony of Kucinski in the course of his closing argument.

D. The trial judge did not err in charging the jury that "Under the evidence produced by the plaintiffs in this case, defendant, Baldwin, was under no duty to stop in the center of Richmond Street and wave the children across before commencing his right hand turn" (paragraph 8 of defendants' points for charge (Document No. 33), appearing at N.T. 1143).

■ In Pennsylvania, motorists are not required to anticipate that a child will run from a place of safety into the path of oncoming vehicles, but motorists are charged with care under the circumstances. See Robb v. Miller, 372 Pa. 505, 94 A.2d 734 (1953).

The most recent, factually similar, Pennsylvania appellate court case held that a truck driver, seeing children playing on the sidewalk at a street intersection where he had turned right and had reason to apprehend that children might place themselves in a place of danger, therefore owed them a duty to have his truck under such control that it could be stopped on the shortest possible notice of danger to them and to exercise such care as is reasonably necessary to avoid injuring them. Chapple v. Sellers, 365 Pa. 503, 76 A.2d 172, 30 A.L.R.2d 1 (1950). The trial judge read several sentences from this case to the jury at N.T. 1138–9 before reading the above complained of language from defendants' points for charge, which was preceded by this statement (N.T. 1139):

"The parties have certain points for charge on this, which are just one-sentence statements, and they are true; but I suggest that you consider them in the light of that rather complete statement that I have read you, because these are just one paragraph at a time on a certain point, and I think what I have just read you from this case gives you the picture."

■ The trial judge then read plaintiffs' points for charge 2–5 (Document No. 32), as follows (N.T. 1140–1):

" 'P–2. Where a driver sees a child and has reasonable grounds to apprehend that the child may run into his path, a higher degree of care is required than under ordinary circumstances.'

"I think these all fit in with what I have read you, but if they do not, these are correct statements of the law.

" 'P–3. A driver must keep in mind when turning corners into intersecting streets, and the lights are favorable to pedestrians, that the pedestrians' rights are paramount.'

"Now, what is meant by that is that if the pedestrian gets to the corner and starts his crossing at the same time as the car does, the pedestrian's rights are paramount; but if the driver has gotten there first and he started across the crosswalk, then the pedestrian cannot run in front of him or run into the side of him. A pedestrian's rights are not paramount to that extent.

" 'P–4. The degree of care required of a driver at an intersection is greater than that required between intersections.

" 'P–5. In driving through any locality where children are known to be in movement, motorists should drive with the care and caution of one walking through an infant's nursery.' "

The testimony reveals that the driver kept the children under observation until after he commenced his turn. Therefore, the trial judge did not err in reading defendants' eighth point for charge (N. T. 1143).

E.  The trial judge did not err in his reference to the testimony with respect to the direction in which the group of boys was facing immediately prior to the accident (page 26 of Document No. 47).

Plaintiffs' contention that Jimmy's back was to the truck driver around the time of the accident is not supported by the evidence. Kucinski testified that when Jimmy ran off the curb he was looking at the northwest corner of the intersection (N.T. 59–60). Baldwin said he saw them playing and did not recall the directions in which they faced (N.T. 165–6).

The court's summary of the evidence with respect to the direction of the boys was accurate (N.T. 1133).

At the conclusion of the charge, the trial judge made an additional statement (N.T. 1180), clearly leaving it to the jury as to their recollection of the facts:

"First of all, I want to emphasize that I have not begun to go over all the testimony. I just pointed out a few things in order to make points clear. You must, of course, consider all the testimony in deciding any point. For example, the plaintiff says that you can infer that the boys were standing with their backs to the truck driver because they were about to cross the street. He said at one point that they were about to cross the street. Well, that is right, and you could so infer. It is up to you."

Plaintiffs' contention "that there was evidence from which the jury could infer —indeed almost had to infer—that at least some of the children had their backs to the driver," is not supported by the record and, even if it was so supported, the above quote, if anything, was more favorable to plaintiffs than the record would justify. The charge on this point is not ground for a new trial in view of F.R.Civ.P. rule 51.

F.  Other alleged errors of the trial judge with reference to the liability issues.

The many points raised in plaintiffs' reasons for new trial (Documents Nos. 36, 37 & 45) and in their two briefs have been considered by the trial judge, who believes they have no merit.[7]  In view of

---

7. For example, plaintiffs' contention (page 50 of Document No. 47) that their counsel was not given any opportunity to present arguments on defendants' points for charge is not substantiated by the record. The points for charge were considered at N. T. 951–973. The trial judge even included in his charge language which plaintiffs' counsel suggested orally and not in writing (N. T. 953 and 1153–4), which is contrary to F.R.Civ.P. rule 51 and the practice in this court.

Counsel for defendants asked to be heard on plaintiffs' points for charge and was granted this permission (N. T. 955–6). Counsel for plaintiffs never made any such request at the time the court ruled on defendants' points (N. T. 972–3), but first asked to submit argument in objection to defendants' points for charge after the closing arguments (N. T. 1120). F. R.Civ.P. rule 51 requires the trial judge to rule on the requests for charge before the arguments of counsel to the jury

the apparent holding in Trout v. Pennsylvania Railroad Company, 300 F.2d 826, 829–830 (3rd Cir. 1962) (see, particularly, pp. 4–7 of Petition for Rehearing, denied on 5/28/62), that any reason for new trial stated in a brief filed prior to entry of an order ruling on a post-trial motion may be the basis for grant of such motion, the briefs of counsel filed with the court are being placed in the Clerk's file as Documents Nos. 47, 48 and 49.

### III. Alleged errors of the trial judge on the issues of damages.

In view of the negative answer of the jury to question 1, there is no need to discuss these alleged errors.[8] See Burch v. Reading Company, 140 F.Supp. 136, 147 & 161 (E.D.Pa.1956), aff'd 240 F.2d 574 (3rd Cir. 1957), cert. den. 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957).

However, these references to the record may be helpful. During the closing argument of plaintiffs' counsel, such statements as the following were made:

"* * * I am asking you now, upon whose shoulders should the terrible burden of these injuries— upon whose shoulders should they rest? Upon the shoulders of little Jimmie Romer, who was five years old at the time this accident happened, or upon the shoulders of this Smith Transfer Company * * *." (N.T. 994)

"Let me say this, members of the jury: Jimmy Romer is in court today. He is not going to be able to come back to you when he is 40 years old in 1990 and say, 'Members of the jury, I have had a tough 20 years since I was 20 years old * * *.'" (N.T. 1041).

This language justified the statements of counsel for defendants in his closing argument at N.T. 1050 and 1097.

As to the objection of counsel for plaintiffs to the language concerning the driver[9] in the charge, while the court was instructing the jury that the interest of a witness should be considered in evaluating his testimony (N.T. 1126–8), the following language from a conversation between counsel for plaintiffs and the court immediately prior to the charge is significant (N.T. 1118–9):

"THE COURT: * * * Under the law, isn't it true that Mr. Baldwin is personally liable if he is at fault? If his employer has insurance or no matter what it is, they have the right to sue the man who is at fault. Isn't that so?

"MR. MANN: Yes sir, no question about it, no question about it, but Mr. Williams's remarks were not

---

so that it would be improper for him to change such rulings on the basis of argument presented after arguments of counsel to the jury.

8. As to the prohibition of use of a blackboard first proposed by counsel for plaintiffs during the closing argument, the trial judge adhered to the rule consistently followed by him, and stated in a published opinion over four years prior to the trial [see Davis v. Haldeman, 150 F.Supp. 669, 673 (E.D.Pa.1957)], that if counsel wish to write damage figures on the blackboard for use during their closing arguments, such figures must be submitted to their adversary and to the trial judge for comment prior to the time that the closing arguments begin.

9. This language appears at N. T. 1127–8: "Now, Mr. Baldwin is interested. And

in considering the interest of Mr. Baldwin, of course, you must take into account that he is the one who is being alleged to be the wrongdoer, and if the plaintiffs are correct, and he was negligent, even though as between these plaintiffs and his employer, the Smith's Transfer Company, the Smith's Transfer Company has to respond in damages, because he was acting within the scope of his employment, they have the right to sue him for anything they have to pay, because if you find he is the wrongdoer, he is the one primarily liable. They did not employ him to be negligent. And if you find a verdict for the plaintiffs in this case, you will be finding that he was a wrongdoer. So, you see, he is the one primarily interested on the defendants' side, and to that extent you may find that he has the greatest interest in this case."

so limited. His remarks referred to the future, as though he was going to be personally affected in the future by this case, and we both know, sir, that that is not so.

\*   \*   \*   \*   \*   \*

"THE COURT: \* \* \* As I understand it, whoever has to pay any verdict in this case has the right to collect it from Mr. Baldwin. If you had not sued him, then this verdict would not be res judicata as to him, but you have sued him. If he is held at fault, the responsibility is his. His principal did not hire him to be negligent. His principal is responsible to the third person, but his principal can recover from an agent who violates the law. Now, isn't that the law?

"MR. MANN: That is correct, sir. That is the law \* \* \*."

The trial judge finds no merit to the complaints of plaintiffs on the issues of damages in the light of F.R.Civ.P. rule 51 and, in view of the many days devoted to medical testimony in this case, suggests that if a new trial should be required, it should be limited to the liability issue.

■ In view of the facts that the plaintiff suffering personal injuries in this accident was a minor who was five years of age and that he has had an excellent recovery, the verdict was not so inadequate as to justify the court's substituting its views for those of the jury and granting a new trial. See, for example, Georgia Automatic Gas Co. v. Fowler, 77 Ga.App. 675, 49 S.E.2d 550 (1948); Chapple v. Sellers, 373 Pa. 544, 96 A.2d 868 (1953); Patterson v. Palley Manufacturing Co., 360 Pa. 259, 61 A.2d 861 (1948); 16 A.L.R.2d at 209. The fact that some juries would have given higher verdicts for injuries which are less serious, as indicated in the cases submitted by counsel for plaintiffs on April 26, 1962, which have been attached to plaintiffs' brief (Document No. 47),

does not justify the court in granting a new trial on the ground that the verdict was inadequate.

For the foregoing reasons, the post-trial motions will be denied.